**BROADCAST MUSIC, INC., Boudleaux Bryant and Felice Bryant, a partnership, d/b/a House of Bryant Publications, Ahab Music Company, Inc., Arc Music Corp., A. E. Owens, an Individual, d/b/a Blue Book Music, Waylon Jennings and Thomas P. Glaser, a partnership, d/b/a Baron Music Publishing Company, Willie Nelson Music Inc., d/b/a Willie Nelson Music Publishing, and Shelby Singleton Music, Inc., Plaintiffs,**

v.

**MOOR–LAW, INC., a Delaware Corporation, and/or Robert C. Moor, Jr., an Individual, d/b/a Triple Nickel Saloon, Defendants.**

Civ. A. No. 77–325.

United States District Court,
D. Delaware.

Jan. 4, 1980.

David A. Drexler, William H. Sudell, Jr., and John F. Johnston of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiffs.

William J. Wier, Jr., Robert Jacobs and Terry C. Seningen of Bader, Dorsey & Kreshtool, Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

In these consolidated actions[1] plaintiffs, owners of copyrights to musical compositions and Broadcast Music, Inc. ("BMI"), a New York corporation which licenses the public performance rights to copyrighted musical compositions contained in its repertory,[2] have brought suit against Moor-Law, Inc. ("Moor-Law"), a Delaware corporation doing business in Delaware as the Triple Nickel Saloon ("Triple Nickel"), and Robert C. Moor, Jr. ("Moor"), its sole owner and president. Plaintiffs allege that defendants are responsible for fourteen separate acts of infringement of copyrights contained in the BMI repertory occurring at the Triple Nickel on March 11, 1977 and October 13, 1978.[3] They seek damages, an injunction, and costs, including attorneys' fees. Defendants respond that plaintiffs have failed to prove infringement of songs contained in BMI's repertory. They assert as an affirmative defense that plaintiffs have misused their copyrights and are, therefore, not entitled to enforce them. In addition, they assert a counterclaim against the plaintiffs,

alleging that their licensing activities violate the Sherman and Clayton Acts, and seeking an injunction, treble and punitive damages, and costs, including attorneys' fees.

The case is now before me on plaintiffs' motion for summary judgment, pursuant to Fed.R.Civ.P. 56. Rule 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(e) provides that a party opposing a summary judgment motion properly made and supported "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." As to plaintiffs' claims that defendants caused their copyrights to be infringed, defendants have failed to set forth by affidavit, deposition, answer to interrogatory, or admission that any genuine issue of fact exists for trial. On the other hand, material issues of fact remain unresolved as to whether the licensing practices which BMI concededly employs violate the federal antitrust laws and constitute copyright misuse. Accordingly, plaintiffs' motion for summary judgment must be denied, but the issues for trial can be narrowed as contemplated by Rule 56(d).

## BACKGROUND

BMI, a non-profit corporation organized in 1939, is the second largest licensor of performing rights to copyrighted musical

---

1. These actions were consolidated by Order of this Court on March 6, 1979. *See* Docket No. 60.

2. Individual owners of the copyrights allegedly infringed were joined as plaintiffs, with BMI, in the first filed action. *See* Docket No. 1. The second filed action was brought in the name of BMI alone. *See* Civil Action No. 79-96, Docket No. 1.

3. The Copyright Act, 17 U.S.C. § 101, *et seq.* (1978), was substantially amended on October 19, 1976, effective January 1, 1978. Thus, the first filed action is governed by the Copyright Act of 1909, as amended prior to October 19, 1976, while the second filed action is governed by the law as amended on that date. Except as noted *infra* the changes enacted do not affect the analysis required to resolve the legal issues presented in these consolidated actions.

compositions in the United States. The American Society of Composers, Authors and Publishers ("ASCAP"), BMI's larger competitor, has approximately 22,000 composer and publisher members and a repertory containing some 3,000,000 compositions. Approximately 30,000 publishers and writers are affiliated with BMI, whose repertory contains approximately 1,000,000 compositions. Almost all domestic copyrighted compositions are in either ASCAP's or BMI's repertory. *Columbia Broadcasting System, Inc. v. ASCAP*, 400 F.Supp. 737 (S.D.N.Y.1975) ("*CBS II*"), rev'd and remanded, 562 F.2d 130 (2d Cir. 1977) ("*CBS III*"), rev'd and remanded sub nom. *BMI v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) ("*CBS IV*").

The Triple Nickel is a restaurant-nightclub in which live music is performed seven nights a week by bands hired by Moor. Both well-known and relatively unknown performers appear at the Triple Nickel, but no particular performer or group of performers appears for more than a few nights at a time.

Plaintiffs allege that in January and February, 1977, representatives of BMI first informed defendants that if entertainers appearing at the Triple Nickel performed songs within BMI's repertory, defendants were required to obtain either a license from BMI or permission from the songs' respective copyright owners. According to plaintiffs, defendants refused to seek such authorization. Plaintiffs further allege that on May 11, 1977, a representative of BMI visited the Triple Nickel for the purpose of making a list of songs performed which were within the BMI repertory. According to plaintiffs, six such songs were performed that evening.[4] After again informing defendants of the necessity of obtaining a license or permission before permitting the performance of copyrighted songs at the Triple Nickel and after again failing to convince defendants to seek such authorization, plaintiffs allege, plaintiffs sued defendants for copyright infringement.[5] On October 13, 1978, plaintiffs allege that a second representative of BMI visited the Triple Nickel, again for the purpose of making a list of those songs performed which were within BMI's repertory. According to plaintiffs, eight such songs were performed on that evening,[6] and a second copyright infringement action was instituted.[7]

Defendants neither admit nor deny that plaintiffs' songs were performed at the Triple Nickel as alleged by plaintiffs. Rather, they claim that Moor was not present at the Triple Nickel on the evenings in question and does not know what songs were performed on those occasions, and that such information is not contained in the Triple Nickel's records. They assert that genuine factual issues exist as to whether plaintiffs' songs were performed as alleged by plaintiffs. In particular, they claim that BMI's representatives were unable as a matter of law to determine whether songs performed at the Triple Nickel infringed plaintiffs' copyrights because the representatives were not members of the "general audience"; that their sworn affidavits should be discounted because of their interest, as employees of BMI, in the outcome of the litigation; that the process by which BMI's representatives noted which songs were performed at the Triple Nickel was characterized by "fatal deficiencies", and that, even if BMI's factual allegations are true, it remains possible that the performances in question constituted "fair use" of plaintiffs' copyrights.

---

4. The songs within BMI's repertory which plaintiffs allege were performed at the Triple Nickel on May 11, 1977 were "Okie From Muskogee," "Rub It In," "Rocky Top," "Johnny B. Goode," "A Good Hearted Woman," and "Before The Next Teardrop Falls."

5. *See* Docket No. 1.

6. The songs within BMI's repertory which plaintiffs allege were performed at the Triple Nickel on October 13, 1978 were "Johnny B. Goode," "Make The World Go Away," "Green, Green Grass of Home," "(Shake, Shake, Shake) Shake Your Booty," "Let Me Be There," "Before The Next Teardrop Falls," "Crying Time," and "The Midnight Hour."

7. *See* Civil Action No. 79–96, Docket No. 1.

Additionally, defendants strongly deny plaintiffs' allegation that defendants refused to negotiate for a license with BMI. They contend that they always desired to obtain a license for songs within BMI's repertory which were actually performed at the Triple Nickel. They aver, however, that BMI was willing to issue only a blanket license, covering all songs in its repertory, and for which payment was to be based on the Triple Nickel's total entertainment expenses, without regard to actual use of compositions BMI had a right to license. While they admit that BMI offered them a per piece license as an alternative to a blanket license, they characterize that offer as a "sham," either because BMI was not actually willing to grant such a license or because BMI knew that a per piece license would not satisfy the needs of the Triple Nickel. At the very least, they argue, genuine factual issues exist as to whether plaintiffs' allegedly coercive licensing practices constitute a misuse of the copyright monopoly and a violation of the antitrust laws.[8]

## THE CONSENT DECREES

This is not the first time BMI's licensing activities have been challenged under the antitrust laws. "Neither ASCAP nor BMI is a stranger to antitrust litigation." *CBS II, supra,* 400 F.Supp. at 743. A government suit against ASCAP in 1941 resulted in a consent decree which, as amended in 1950, has largely governed ASCAP's dealings with licensees. *See United States v. ASCAP,* 1940–1943 Trade Cas. ¶ 56,104 (S.D.N.Y.1941); *United States v. ASCAP,* 1950–1951 Trade Cas. ¶ 62,595 (S.D.N.Y. 1950). Consent decrees were also issued against BMI in 1941 and 1966 following initiation of government antitrust suits against it. *See United States v. BMI,* 1940–1943 Trade Cas. ¶ 56,096 (E.D.Wis.

1941); *United States v. BMI,* 1966 Trade Cas. ¶ 71,941 (S.D.N.Y.1966).

The consent decrees, though similar, are not identical. The Supreme Court has summarized the provisions of the 1950 amended ASCAP consent decree as follows:

> [M]embers may grant ASCAP only non-exclusive rights to license their works for public performance. Members, therefore, retain the rights individually to license public performances, along with the rights to license the use of their compositions for other purposes. ASCAP itself is forbidden to grant any license to perform one or more specified compositions in the ASCAP repertory unless both the user and the owner have requested it in writing to do so. ASCAP is required to grant to any user making written application a nonexclusive license to perform all AS-CAP compositions either for a period of time or on a per program basis. ASCAP may not insist on the blanket license, and the fee for the per program license, which is to be based on the revenues for the program on which ASCAP music is played, must offer the applicant a genuine economic choice between the per program license and the more common blanket license. If ASCAP and a putative licensee are unable to agree on a fee within 60 days, the applicant may apply to the District Court for a determination of a reasonable fee, with ASCAP having the burden of proving reasonableness.

*CBS IV, supra,* 99 S.Ct. at 1558. The 1966 BMI decree, conversely, does not state that BMI may obtain only nonexclusive rights from its affiliates.[9] While the BMI decree does provide for submission of disputes between BMI and writers, publishers, and users to arbitration, it makes no provisions for determination of reasonable fees by the District Court for the Southern District of

---

8. At oral argument counsel for defendants conceded that two defenses raised earlier—that defendants are not liable for any copyright infringement committed by performers appearing at the Triple Nickel because such performers are not employees of Moor-Law, and that Moor is not liable for such infringements because he does not do business personally as the Triple

Nickel—are not "viable." Tr. of Oral Arg. at 17–18.

9. Indeed, BMI is the sole and exclusive licensor of the right to perform publicly for profit the copyrighted musical compositions involved in these actions.

New York. *United States v. BMI, supra,* 1966 Trade Cas. ¶ 71,941 at Para. VII(C). Finally, the BMI decree *requires* BMI to offer per piece licenses to non-broadcast users seeking performance rights for particular compositions, *id.* at Para. IX(C),[10] whereas the amended ASCAP decree merely *permits* ASCAP to issue such licenses. *United States v. ASCAP, supra,* 1950–1951 Trade Cas. ¶ 62,595 at Para. VI. Despite the licensing alternatives contained in the consent decrees applicable to both BMI and ASCAP, both organizations have continued to grant blanket licenses in most instances. *See CBS IV, supra,* 99 S.Ct. at 1555.

THE INFRINGEMENT ISSUE

■ The Copyright Act of 1976 states: "[T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following: . . . (4) in the case of . . . musical . . . works, to perform the copyrighted work publicly." 17 U.S.C. § 106 (1977). Anyone who performs publicly, or causes to be so performed, a copyrighted musical composition without first obtaining authorization from the copyright owner or his assignee is an infringer under the 1976 Act. 17 U.S.C. § 501. The Copyright Act of 1909 contained similar provisions. Section 1 of the 1909 Act provided, in part, "Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right: . . . (e) To perform the copyrighted work publicly for profit if it be a musical composition." Section 101 of repealed Title 17 stated, "If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable . . . ."[11] In attempting to prove that their copyrights have been infringed, plaintiffs bear the burden of demonstrating the originality and authorship of the songs allegedly infringed, compliance with the formalities of the Copyright Act, that plaintiffs are proprietors of the copyrights, that the songs were performed as alleged, and that such performance was without proper authorization. *See, e. g., Chess Music, Inc. v. Tadych,* 467 F.Supp. 819 (E.D.Wis.1979); *BMI v. Gary W. Marshall,* Civ. Action No. 77–40087 (E.D.Mich.1978).

■ No factual dispute exists as to four of these five elements. Plaintiffs have filed certificates of copyright for each of the twelve compositions allegedly infringed.[12] Under 17 U.S.C. § 410(c), as well as Section 209 of repealed Title 17, registration certificates generally constitute *prima facie* evidence of originality, authorship, and compliance with statutory formalities. *See* M. Nimmer, *Nimmer on Copyright,* § 12.11[A], [B]. *See also Telex Corp. v. International Business Machines Corp.,* 367 F.Supp. 258, 361 (N.D.Okl.1973), *rev'd on other grounds,* 510 F.2d 894 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46

---

**10.** Paragraph IX(C) of the 1966 BMI consent decree provides as follows:

> Defendant [BMI] shall not, in connection with any offer to license by it the public performance of musical compositions by music users other than broadcasters, refuse to offer a license at a price or prices to be fixed by defendant with the consent of the copyright proprietor for the performance of such specific (i. e., per piece) musical compositions, the use of which shall be requested by the prospective licensee.

**11.** The 1909 Act prohibited only unauthorized public performance *for profit* of musical compositions, whereas the 1976 Act prohibits all unauthorized public performance. The distinction is of no consequence in the context of this litigation, however, in light of the fact that musical compositions performed in establishments such as the Triple Nickel have traditionally been considered "for profit" whether or not admission has been charged.

> A public performance for profit may exist even though no admission fee is exacted or no profit actually made. Accordingly, the performance of a copyrighted musical composition in a restaurant or hotel, without charge for admission to hear it, infringes the exclusive right of the owner of the copyright to perform the work publicly for profit. The performance is part of a total for which the public pays, and the fact that the price of the whole is attributed to a particular item is not important.

18 *Am.Jur.2d* Copyright and Literary Property, § 120 (1965) (footnote omitted). I find that music is performed publicly for profit at the Triple Nickel.

**12.** *See* Docket No. 82, Exhs. A–L.

L.Ed.2d 244 (1975); *Remick Music Corp. v. Interstate Hotel Co.*, 58 F.Supp. 523, 531 (D.Neb.1944), *aff'd*, 157 F.2d 744 (8th Cir. 1946), *cert. denied*, 329 U.S. 809, 67 S.Ct. 622, 91 L.Ed. 691 (1947). Where the plaintiff in an infringement action is also the author of the composition, the registration statement is also generally *prima facie* evidence of ownership. *Nimmer, supra*, at § 12.11[C]. Where, however, the plaintiff, like BMI, is an assignee of a previously registered copyright, the plaintiff must tender additional evidence in order to make a *prima facie* showing of proprietorship. *Id.* Plaintiffs have done so here by filing copies of assignments to BMI of all compositions alleged to have been infringed.[13] In any event defendants have not disputed plaintiffs' contentions regarding originality, authorship, compliance with statutory formalities, and proprietorship. Therefore, I accept these elements of plaintiffs' copyright infringement claim as having been established. Additionally, defendants have admitted never obtaining any kind of license to perform the songs whose copyrights plaintiffs allege were infringed.[14] Thus, I also conclude that defendants failed to obtain requisite authorization prior to the evenings on which the acts of infringement are alleged to have occurred.

As noted above, however, defendants do take issue with plaintiffs' allegations regarding the remaining element of plaintiffs' infringement claim, the proposition that the particular songs alleged by plaintiffs were actually performed at the Triple Nickel. While defendants do not deny that plaintiffs' songs were performed at the Triple Nickel as plaintiffs allege, they insist that a genuine factual dispute exists over this issue. In support of this contention defendants argue, first, that fatal deficiencies exist in the logging technique employed by BMI's representatives on the evenings in question. They contend that the log forms used called for notation of both melody and lyrics and that both must be noted to support a claim of infringement, but that

BMI's representatives failed to note the lyrics of the songs they claim to have heard. In addition, defendants assert, the affidavits of BMI's representatives are not competent to establish infringement because the representatives are experts rather than members of the "general audience" and because they "obviously have a vested interest in categorizing songs as BMI property." Plaintiffs respond that BMI's representatives filled out their logs completely and accurately, that, in any event, the law does not require consideration of both melody and lyrics to establish that a given performance infringes a particular copyright in a case such as this, and that the representatives' sworn affidavits make out a *prima facie* case that the songs performed at the Triple Nickel on the evenings in question infringed the copyrights of songs in BMI's repertory.

██ Although copying is an essential element of a copyright infringement claim, direct evidence of copying is rarely available. *See, e. g., Blumcraft of Pittsburgh v. Newman Bros., Inc.*, 373 F.2d 905, 906 (6th Cir. 1967). In recognition of this fact "[e]vidence of access and substantial similarity are in themselves sufficient to create an inference of copying." *Nimmer, supra*, § 12.11[D]. When the owner of a copyright produces competent evidence of substantial similarity between the alleged infringing performance and the copyrighted composition and the alleged infringer produces competent evidence of a difference between the two, it is true that the "focus should be placed on music and lyrics *taken together*," *Stratchborneo v. Arc Music Corp.*, 357 F.Supp. 1393, 1405 (S.D.N.Y.1973) (emphasis in original), and that "[t]he eyes through which 'substantial and material similarity' is to be judged are those of the general audience for whom the copyrighted work was intended and not those of the experts in the field." *Rexnold, Inc. v. Modern Handling Systems, Inc.*, 379 F.Supp. 1190, 1195 (D.Del.1974). Thus, if copying had been put in issue, the failure of BMI's representa-

---

13. *See id.*, Exhs. M–W.

14. *See, e. g.*, Docket No. 32, at 32.

tives to make a written record of the lyrics of the songs they heard at the Triple Nickel and the representatives' possession of musical expertise would be relevant factors to be considered in resolving whether copying had in fact occurred, as would the representatives' alleged interest in categorizing songs as BMI property.

██ But on the present record there is no conflicting evidence on the issue of copying. Pursuant to Rule 56, plaintiffs have supported their motion with, *inter alia*, the sworn affidavits of the BMI representatives who allegedly witnessed the alleged acts of infringement at the Triple Nickel, together with the "infringement report" prepared by each on the evening of his visit.[15] Defendants, on the other hand, have failed, by affidavit or as otherwise provided by Rule 56, to set forth any evidence which would suggest that the copyrighted compositions were not performed at the Triple Nickel on the evenings alleged. Accordingly, plaintiffs are entitled to a determination that defendants have infringed their copyrights. *KECA Music, Inc. v. Dingus McGee's Co.*, 432 F.Supp. 72, 74 (W.D.Mo.1977).[16] If plaintiffs prevail on the issue of misuse, they will be entitled to judgment in their favor on their infringement claims.

### THE COPYRIGHT MISUSE—ANTITRUST ISSUES

Both defendants' copyright misuse defense and their antitrust counterclaim are based upon what defendants allege to be BMI's licensing policies and practices for users such as the Triple Nickel. Defendants, in asserting that material issues remain unresolved with regard to their defense and counterclaim, and plaintiffs, in insisting that these matters should be dis-

posed of by summary judgment, both purport to find support for their positions in the latest pronouncement of the Supreme Court on this subject. *CBS IV, supra*, 99 S.Ct. 1551.

In the *CBS* case CBS charged that the licensing practices employed by both ASCAP and BMI constituted monopolization, price-fixing, and tying, all in violation of the Sherman Act, as well as misuse of the copyright monopoly. *See CBS II, supra*, 400 F.Supp. at 745. Significantly, CBS did not allege that either of the performing rights societies sued had violated the consent decrees applicable to it. *Id.* Rather, it contended that the licensing practices sanctioned by the decrees themselves violated the antitrust laws and constituted copyright misuse.

After denying defendants' motion for summary judgment, *Columbia Broadcasting System, Inc. v. ASCAP*, 337 F.Supp. 394 (S.D.N.Y.1972) ("*CBS I*"), the District Court, focusing primarily on the tying issue, sanctioned defendants' conduct and dismissed the complaint. *CBS II, supra*, 400 F.Supp. 737. The Second Circuit Court of Appeals reversed, concluding that the defendants' blanket licenses represented price-fixing and were, therefore, illegal *per se*, and that they further constituted copyright misuse. *CBS III, supra*, 562 F.2d at 140, 141 n. 29. This ruling was overturned by the Supreme Court. *CBS IV, supra*, 99 S.Ct. 1551.

The Supreme Court agreed with the lower courts that the consent decrees did not immunize BMI and ASCAP from antitrust challenges by nonparties to the prior litigation. *Id.* at 1559. With respect to the price-fixing claim, however, the Court held that blanket licensing in accordance with the consent decrees is not a *per se* violation

---

**15.** *See* Docket Nos. 83, 84.

**16.** As to defendants' contention that a genuine factual dispute exists as to whether the performance of plaintiffs' songs at the Triple Nickel may have constituted "fair use" and did not, therefore, infringe plaintiffs' copyrights, I need only note that defendants raised this contention for the first time in their brief in opposition to plaintiffs' motion for summary judgment. Defendants' failure to assert a fair use defense in their amended answer to plaintiffs' complaints or in an appropriate manner pursuant to Rule 56(e) precludes them from raising it at this late date. Certainly nothing in the present record suggests that such a defense is available to the defendants.

of the Sherman Act. Instead, the Court stated, the practice must be subjected to rule of reason analysis in order to determine whether it is an unreasonable restraint of trade. *Id.* at 1565. In addition, finding the Court of Appeals' determination with respect to copyright misuse to be dependent on its findings of a violation of the antitrust laws, the Supreme Court reversed that portion of the judgment as well. *Id.* Finally, the Court declined to address the claims of monopolization and tying because CBS failed to raise them in its petition for *certiorari. Id.*, n. 43.

In support of their motion for summary judgment plaintiffs herein point to statements by the Court, which they say are consistent with pronouncements by other courts in other cases,[17] to the effect that the blanket license is a necessity for users such as the Triple Nickel. In describing the emergence and evolution of blanket licensing, the Court stated:

> ASCAP and the blanket license developed together out of the practical situation in the market place: thousands of users, thousands of copyright owners, and millions of compositions. *Most users want unplanned, rapid and indemnified access to any and all of the repertory of compositions,* and the owners want a reliable method of collecting for the use of their copyrights. Individual sales transactions in this industry are quite expensive, as would be individual monitoring and enforcement, especially in light of the resources of single composers. Indeed, . . . *the costs are prohibitive for licenses with individual radio stations, night clubs, and restaurants,* . . . and it was in that milieu that the blanket license arose.

*Id.* at 1563 (emphasis added).[18] The Court also observed,

> With the advent of radio and television networks, market conditions changed, and the necessity for and advantages of a blanket license for those users may be far less obvious than is the case when the potential users are individual television or radio stations, or the thousands of other individuals and organizations performing copyrighted compositions in public.

*Id.* A licensing arrangement without which the market of smaller users for the right to perform publicly copyrighted music could not exist, plaintiffs urge, can hardly be an unreasonable restraint of trade. Defendants, conversely, point out that the Supreme Court in the *CBS* case did not *hold* that the licensing practices of BMI and ASCAP under their respective consent decrees are lawful under the federal antitrust laws. In addition, they note that the Supreme Court did not reach CBS's monopolization claims. Consequently, they contend, they must be given the chance to prove each of their antitrust claims as well as their related copyright misuse counterclaim at trial.

I conclude that plaintiffs' motion for summary judgment cannot be granted on the basis of the *CBS* case. Although the Supreme Court noted the apparent necessity of some kind of blanket license for small music users such as restaurants and night clubs, those observations must be evaluated in light of the fact that the parties had not built a record on, and the Court was not required to address, the issue of whether the blanket license constitutes an unreasonable restraint of trade with respect to non-broadcast network users. More noteworthy is the Court's holding that at least with respect to broadcast network music users, the performing rights societies' licensing practices under the consent decrees must be subjected to rule of reason analysis.

█ Nor is my conclusion altered by the other cases plaintiffs cite, each of which was decided prior to *CBS IV, supra,* 99 S.Ct.

---

17. Plaintiffs place particular reliance upon *BMI v. Grant's Cabin, Inc.,* Cause No. 77–1192C(1) (E.D.Mo. March 14, 1979); and *K–91, Inc. v. Gershwin Publishing Corp.,* 372 F.2d 1 (9th Cir. 1967), *cert. denied,* 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968).

18. The quoted passage must be assumed to refer to BMI as well. *CBS IV, supra,* 99 S.Ct. at 1555 n. 5.

at 1551. In *K–91, Inc. v. Gershwin Publishing Corp.*, 372 F.2d 1 (9th Cir. 1967), the Ninth Circuit Court of Appeals held that ASCAP's licensing practices do not violate the Sherman Act. The soundness of the conclusion of law asserted in *K–91*, that ASCAP has been "disinfected" by the consent decree applicable to it, is doubtful, however, in the wake of the Supreme Court's determination in *CBS* that the consent decrees governing the licensing practices of the performing rights societies do not immunize them from antitrust challenges by nonparties to the earlier litigation. Moreover, the *K–91* case is factually distinguishable from the instant action in several potentially material respects. First, in *K–91* the Court was called upon to construe the amended ASCAP consent decree, which differs from the 1966 BMI decree in that, *inter alia*, copyright owners may confer only nonexclusive rights upon ASCAP and potential users may obtain a determination of the reasonableness of ASCAP's rates from the District Court for the Southern District of New York.[19] Additionally, in *K–91* the parties stipulated that per use licensing of copyrighted musical compositions by individual broadcasters was impossible[20] and no alternative to the licenses available under ASCAP's consent decree was proposed to the Court. Here, on the other hand, while the defendants seem to agree that a per piece license would not satisfy their needs, they have proposed to the Court an alternative licensing arrangement not provided for under the 1966 consent decree.[21] In light of the questionable legal conclusions and distinguishable factual record on which the *K–91* holding was based, it does not support plaintiffs' motion for summary judgment here. Because the District Court for the Eastern District of Missouri relied heavily on *K–91* in *BMI v. Grant's Cabin, Inc., supra*, Cause No. 77–1192C(1), that case affords no additional support for a grant of summary judgment in plaintiffs' favor.

Quite apart from the *CBS* case, plaintiffs claim to be entitled to summary judgment with respect to their alleged misuse of copyrights and violations of the antitrust laws because defendants have tendered no evidence to support their allegation that BMI forced them to accept a blanket license or to forego use of compositions in its repertory. Plaintiffs point out that, to the contrary, undisputed evidence in the record demonstrates that the defendants have never requested any form of license and that, indeed, BMI has voluntarily offered defendants a per piece license. They strenuously urge that no violation of the copyright or

---

**19.** The soundness of the Court's rationale in the *K–91* case has also been questioned in light of that Court's conclusion that ASCAP's blanket license cannot constitute price-fixing because a potential user may "invoke the authority of the United States District Court for the Southern District of New York to fix a reasonable fee whenever the applicant believes that the price proposed by ASCAP is unreasonable, and ASCAP has the burden of proving the price reasonable." *K–91, Inc. v. Gershwin Publishing Corp., supra*, 372 F.2d at 4. As the Second Circuit observed in the *CBS* case, reasonableness is not a defense to a claim of price-fixing. *See CBS III, supra*, 562 F.2d at 138 n. 23.

**20.** The parties in *K–91* agreed to the following stipulation:

It would be commercially, practicably and virtually impossible for defendant and almost all other broadcasters to acquire a separate license for each performance broadcast over commercial stations. It would be commercially, practicably and virtually impossible for plaintiffs and other composers, authors and publishers to issue a separate license for each performance broadcast over broadcasting stations or to have their payment for such performances on the basis of each individual use.

Quoted in *CBS I, supra*, 337 F.Supp. at 400.

**21.** In their Brief defendants propose that BMI issue licenses which:

a) reflect the actual or estimated BMI music played by the establishment, b) are tailored to the type or mode of music played (e. g. country and western) or a "musical family" (e. g. country and western, country-rock, folk music and bluegrass music) . . . c) Provide for the payment of fees based on the actual type of BMI music used by the establishment. d) which contains no provision for the payment of a minimum royalty regardless of whether any live music is played, and e) That contains a fee formula which at least attempts to reflect the use of BMI music which BMI has the right to license.

Docket No. 102, at 11.

antitrust laws can be found in the absence of a request by the defendants for a license. This is true as a matter of copyright law, plaintiffs assert, in light of the requirement, recently reiterated by the Supreme Court in *CBS IV*, that "[u]nder the copyright laws, those who publicly perform copyrighted music have the burden of obtaining prior consent." *CBS IV, supra,* 99 S.Ct. at 1561 n. 28. It is equally true, they contend, as a matter of antitrust law. In support of this contention, they cite cases which hold that in treble damage cases based on a conspiracy to deprive the plaintiff of a particular product, the plaintiff must show that a demand for the product was made and refused.[22]

I do not understand defendants to contest that they failed to request a license or that BMI offered to issue a per piece license. They do, however, contend that other evidence of record precludes the entry of summary judgment for plaintiffs. Specifically, defendants point to evidence tending to show (1) that after offering a per piece license, BMI declined to supply a list of the compositions within its repertory, (2) that a BMI employee referred to BMI's standard response to such requests as a "snow job," and (3) that BMI has apparently entered no license more limited than the repertory-wide blanket license with any user similar to the Triple Nickel. Defendants contend that one can infer from this and other record evidence that the per piece license offered by BMI was not a feasible alternative, that BMI was fully aware of this fact,[23] and that it would have been futile to request any license which would have been a feasible alternative to the blanket license. In short, defendants maintain that they have been forced to take a blanket license or forego the use of BMI's compositions because BMI will not issue to a user such as the Triple Nickel a license suited to its needs other than a blanket license and that the futility of requesting such a license relieved it of any legal obligation to do so.

■ I agree with defendants that the present record will support the inferences that a per piece license, particularly where no repertory list is available, is not suitable to the needs of a user in the position of the Triple Nickel and that BMI will not issue a license which is broader than a per piece license yet more narrow than a license covering its entire repertory. It will further support an inference that the request for such a "small blanket" license would have been futile.[24] Further, I agree with defendants' characterization of the applicable law. A plaintiff is not required to make such a futile gesture before suing for damages under the antitrust laws, *see Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 377 F.2d 776 (3d Cir. 1967), *aff'd in part, rev'd in part,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), and I am not prepared to say that the copyright law requires any more before a claim of misuse can be made.

It follows that plaintiffs' motion for summary judgment on the copyright misuse and antitrust claims must be denied. While it is true that BMI offered a per piece license in accordance with its obligations under the consent decree, the issue remains

---

**22.** *Royster Drive-In Theaters, Inc. v. American Broadcasting-Paramount Theaters, Inc.,* 268 F.2d 246, 251 (2d Cir.), *cert. denied,* 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121 (1959); *Webster Rosewood Corp. v. Schine Chain Theaters, Inc.,* 263 F.2d 533, 536 (2d Cir.), *cert. denied,* 360 U.S. 912, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959); *Milwaukee Towne Corp. v. Loew's Inc.,* 190 F.2d 561 (7th Cir. 1951), *cert. denied,* 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952).

**23.** Based on this evidence, defendants characterize BMI's conceded offer of a per piece license as a "sham." I do not understand this

to mean that they contend that BMI would have reneged on its offer if it had been accepted, thereby exposing itself to a contempt proceeding for violation of the consent decree. The present record does not support such a contention. Rather, what is intended, I believe, is that BMI's offer was illusory as a practical matter, with or without a list, and that BMI was aware of that fact.

**24.** *See, e. g.,* Docket No. 113, at 16, where plaintiffs refer to the "inherent impossibility" of fashioning the type of license sought by defendants.

as to whether the licensing practices stipulated in that decree can survive analysis under the rule of reason.

## CONCLUSION

No genuine factual dispute exists as to whether defendants caused plaintiffs' copyrights to be infringed in the manner alleged by plaintiffs. On the other hand, the claims that BMI's activities under the consent decree constitute an unreasonable restraint of trade and a misuse of copyrights because the licensing arrangements sanctioned by the decree afford no real alternative to the blanket license for users such as the Triple Nickel must be analyzed under the rule of reason. Therefore, plaintiffs' motion for summary judgment will be denied.[25]

---

**25.** Neither party has specifically addressed whether BMI's licensing practices under the consent decree with respect to users such as the Triple Nickel may also constitute monopolization in violation of Section 2 of the Sherman Act. Therefore, defendants will have an opportunity to prove their contentions with respect to this aspect of the counterclaim at trial as well.