**THE WALT DISNEY COMPANY**; Metro–Goldwyn–Mayer Inc.; Universal City Studios, Inc.; Paramount Pictures Corporation; Columbia Pictures Industries, Inc.; Warner Bros., a division of Time Warner Entertainment Company, L.P.; Twentieth Century Fox Film Corporation; Tristar Pictures, Inc.; Plaintiffs,

v.

**VIDEO 47, INC.** a/b/a Video 47, Silvia Celorio, individually, and Eduardo Celorio, individually, Defendants.

No. 94–1179–CIV.

United States District Court,
S.D. Florida.

July 9, 1996.

Lisa K. Bennett, Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Fort Lauderdale, FL, for Plaintiffs.

Jeffrey D. Weinkle, Miami, FL, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND FINAL JUDGMENT

UNGARO–BENAGES, District Judge.

THIS CAUSE came before this Court upon this Court's Order to Show Cause and for an evidentiary hearing on April 23, 1996, May 10, 1996, May 31, 1996, June 7, 1996 and June 17, 1996.

THE COURT, having heard the testimony of witnesses, the argument of counsel and having examined the record, and, being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The Plaintiffs are THE WALT DISNEY COMPANY; METRO–GOLDWYN–MAYER INC.; UNIVERSAL CITY STUDIOS, INC.; PARAMOUNT PICTURES CORPORATION; COLUMBIA PICTURES INDUSTRIES, INC.; WARNER BROS., a division of Time Warner Entertainment Company; TWENTIETH CENTURY FOX FILM CORPORATION; TRISTAR PICTURES, INC.; COLUMBIA TRISTAR HOME VIDEO; FOX VIDEO, INC.; and LIVE HOME VIDEO (LIVE AMERICA INC.) (hereinafter collectively referred to as "Plaintiffs").

2. Defendants are VIDEO 47, INC., SILVIA CELORIO, and EDUARDO CELORIO (hereinafter collectively Defendants). Defendants operate a video store at 4735 West Flagler Street, Miami, Florida that rents videocassette tapes of motion pictures to the public. The store is operated by Defendant Eduardo Celorio, and Defendant Silvia Celorio is the Director and sole shareholder. In addition Defendant Silvia Celorio works in the store from time to time at the sales counter at the front of the store. These Defendants were named as defendants in at least three (3) lawsuits alleging the distribution of counterfeit videocassettes and copyright and trademark infringement. In each case, final judgments have been entered against Video 47 (or its predecessor PiWi Video, Inc.), Silvia Celorio (in two of the three judgments), and Eduardo Celorio (in two of the three judgments) in favor of the Plaintiffs.[1] In two of the previous judg-

---

1. On June 11, 1991, Plaintiffs filed *Walt Disney et al. v. PiWi Video, Inc. and Eduardo Celorio, individually*, case number 91–1226–CIV–NESBITT. On July 9, 1991 a civil seizure was conducted at PiWi Video and pursuant to an investigation 580 counterfeit videocassettes were seized from the store premises. Of the 580 videocassettes, 365 titles were identified as motion pictures to which Plaintiffs held copyrights. On April 30, 1993 the Court entered a Consent Decree and Final Judgment pursuant to a settlement agreement which provided that Defendants pay a fine in the amount of Ten Thousand Dollars ($10,000.00). On March 10, 1992 the MPAA received a com-

plaint regarding a store known as Video 47. A search of the corporate records revealed that Video 47 was owned and operated by Silvia Celorio. On March 9, 1993, Plaintiffs filed *Walt Disney et al. v. Video 47, Inc. and Silvia M. Celorio, Individually*, case number 93–455–CIV–NESBITT. On March 22, 1993, 177 counterfeit videocassettes were seized from the store premises and 166 titles were identified as motion pictures to which Plaintiffs held copyrights. Defendants failed to respond to the pleadings and the Court entered an Order of Default on July 30, 1993. On June 10, 1994 Plaintiffs filed *Walt*

ments, including this Court's Judgment in the case now before the Court, the Defendants were adjudged to have infringed upon Plaintiffs' copyrights in certain motion pictures by holding counterfeit copies of the motion pictures out for rent to the public, and the Defendants were enjoined from further infringing on Plaintiffs' rights in the future. In the third case, default judgment was entered in favor of the Plaintiffs for Defendants' failure to respond to the pleadings which asserted the same conduct, copyright infringement by holding counterfeit videos for rental.

3. Plaintiffs are the lawful owners of the exclusive right under the United States Copyright Act to reproduce, to distribute and to authorize the reproduction and distribution of thirteen (13) motion picture titles at issue in this action.[2] The lawful owner of the copyrights to the remaining three (3) titles is Time Warner Entertainment Company, L.P. ("Time Warner").[3] Time Warner is not named as a Plaintiff in this case. However, Warner Bros., a division of Time Warner, is named as a Plaintiff. The copyright certificates reflect that Warner Bros, Inc. (Warner Bros.) was the original copyright owner of the three motion pictures at issue. (Plaintiff Exhibits 8,9,10, Copyright Registration Certificates and Affidavit of Sheldon W. Presser). Pursuant to the *Second Restated Assignment,* dated as of June 30, 1992, Warner Bros. Inc. assigned all of its rights (including copyrights), title and interest to all of its theatrical motion pictures to Time Warner. (Plaintiff Exhibit 10, Affidavit of Sheldon W. Presser).

4. Plaintiffs are members of the Motion Picture Association of America (MPAA), a trade association whose film security office investigates unlawful duplication and distribution of videocassette tapes whose copyrights are owned by members of the MPAA.

5. Based upon a tip to the MPAA, an investigation of Defendants was conducted from October 10, 1995 to October 11, 1995 as testified to by Robert W. Butler ("Butler"), presently a field representative for the Film Security office of the MPAA and formerly a Special Agent in Charge of the Tampa Office for the Federal Bureau of Investigation ("FBI").

6. The investigation of VIDEO 47 was conduced by Patrick R. Cooney ("Cooney"), a former FBI agent who currently works for the anti-piracy office of the MPAA. Cooney employed a "stringer" from the neighborhood to rent tapes from VIDEO 47. Initially, six (6) tapes were rented and five (5) were counterfeit based on the examination of the exterior appearance of the videocassette tapes, according to Cooney's visual examination.

7. Cooney testified that counterfeit copies of videocassette tapes are identifiable because they differ from authorized videocassette tapes which are professionally packaged and labeled. The authentic packaging and labeling contains distinctive art work and the trademarks of the distributing company. Often, legitimate copies also have a distinct mark embedded in the plastic cassette called a "heat stamp" that is not generally present on an unauthorized copy.

8. Butler testified that the Plaintiffs diligently pursue infringers to protect their copyrights and trademarks. Plaintiffs' goodwill and reputation are irreparably damaged by counterfeit copies of inferior quality videocassette tapes. Furthermore, the bootleg distribution of infringing videocassette tapes deprives the Plaintiffs of substantial revenue

---

*Disney et al. v. Video 47, Inc., d/b/a Video 47, Eduardo Celorio, individually and Sylvia Celorio, individually,* case number 94–1179–CIV–UNGARO–BENAGES. On June 15, 1994 a civil seizure was conducted at Video 47 and 254 counterfeit videocassettes and 212 titles were identified as motion pictures to which Plaintiffs held copyrights. On August 4, 1994 the Court entered a Consent Decree and Final Judgment pursuant to a settlement agreement. Defendants paid a fine in the amount often Thousand Dollars ($10,-000.00). In October, 1995, the MPAA received

its third complaint against Video 47 which was the source of the matter before this Court.

**2.** These titles include *Dangerous Minds, Bushwhacked, Demon Night, Fatal Instinct, First Knight, Jade, Kiss of Death, The Lion King, Major Payne, The Net, To Wong Foo Thanks for Everything, The Underneath,* and *Virtuosity.*

**3.** These titles include *Cobra, Something to Talk About,* and *Outbreak.*

and violates the Plaintiffs' exclusive rights to show and distribute those copyrighted titles.

9. Plaintiffs' Ex Parte Motion to Hold Defendants in Contempt (hereinafter referred to as "Motion for Contempt") in the instant action was filed on March 8, 1996. On March 22, 1996, the Court, on Plaintiffs' *Ex Parte* Motion for an Order to Temporarily Seal the Motion and for an Order of Seizure and Impoundment (the "Motion"), issued an Order of Seizure authorizing the seizure of any and all unauthorized videocassette tapes identified in Exhibit "B" to the Motion as well as any other counterfeit videocassette tapes for which any Plaintiff is a copyright owner.

10. On March 28, 1996 the seizure took place under the auspices of the U.S. Marshal Service. An inventory was made of the 53 tapes seized. (*See* Plaintiffs' Exhibit No. 2.) The tapes were boxed and transported by investigator Cooney to the offices of Plaintiffs' counsel, Steams Weaver Miller Weissler Alhadeff & Sitterson, P.A., where they were stored until they were shipped to California for testing.

11. In May, 1996, counsel for Plaintiffs shipped the box of the seized videocassette tapes from Stearns Weaver to the MPAA offices in California for electronic testing. The tests were conducted by Linda Sheer ("Sheer"), an MPAA employee, who the Court accepted as an expert in the area of videocassette tape piracy. Sheer conducted cosmetic and electronic examinations of the 53 tapes seized from Video 47 on March 28, 1996 and found each of the tapes to be bootleg product. (Sheer depo, page 33, lines 13–19.) The tapes were returned to counsel for Plaintiffs after thorough tapes remained in storage until offered as evidence in this proceeding on May 10, 1996.

12. Sheer testified, as an expert, about the various methods of analyzing a videocassette tape to ascertain the authenticity of the cassettes including the use of a cross-pulse monitor, which reveals whether the tapes have been illegally copied. (Sheer Depo page 10, lines 15–25 through page 11 lines 1–19; page 21, lines 20–22 and page 22, lines 3–6).

13. Furthermore, Sheer stated that industry standards for authorized copies of Plaintiffs' copyrighted motion pictures provide for a uniformity of quality both for videocassette tapes produced in the United States and for those manufactured overseas. Those standards provide a basis for identification of unauthorized copies produced overseas. Sheer described the high quality of authorized videotapes—both those made in the United States and in South America—compared to the poor quality of bootleg cassette tapes. (Sheer depo page 93, lines 19–25 through page 94, lines 1–7; page 98, lines 1–16).

14. Defendants did not produce any documentation that showed any authorization by Plaintiffs or any of their distributors to distribute copies of the Plaintiffs' copyrighted motion pictures.

15. Defendant Eduardo Celorio testified and stated that he had been present at three of the seizures which were executed and that he had spoken with MPAA representatives during those seizures regarding the characteristics of legitimate versus illegitimate product produced by Plaintiffs. Mr. Celorio further testified that he met with Cooney again at a later date and was instructed further on the distinguishing characteristics of legitimate product produced by Plaintiffs. Mr. Celorio acknowledged that Cooney advised him to purchase videocassette tapes from legitimate distributors, including but not limited to Baker and Taylor. Despite Mr. Celorio's prior experiences he testified he purchased tapes from individuals who sold videocassettes from their cars and that he contacted his distributors by beeper.

16. Defendant Eduardo Celorio testified that the 16 videocassettes at issue were not available for rental to the public, whereas Mr. Cooney testified that these videocassettes were seized from the portion of the store where the videocassettes were available for rental. The Court rejects the testimony of Defendant Eduardo Celorio and accepts the testimony of Mr. Cooney on this factual issue.

17. Defendants rented counterfeit tapes with counterfeit trademarks, trade names and designations of origin, which violated

Plaintiffs' trademarks, trade names and designations of origin.

18. Defendants' false designations and descriptions deceive and confuse the public as to the videotapes' true source and cause the Plaintiffs' irreparable harm, substantial monetary injuries, losses and damages.

## CONCLUSIONS OF LAW

This action arises out of Plaintiffs' Motion to Hold Defendants In Contempt for violations of prior Orders of this Court. The original cause of action on which the Motion is based arose under the copyright laws of the United States, Title 17, United States Code, and under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125. Jurisdiction is conferred by 28 U.S.C. § 1338, and venue is proper in this district pursuant to 28 U.S.C. § 1400(a).

As stated at ¶ 2, n. 1 of the Findings of Fact, *supra*, this Court entered a Consent Decree and Final Judgment in this case on or about August 4, 1994, pursuant to which the Defendants were permanently enjoined from infringing or participating in the infringement by others of Plaintiffs' rights in any motion pictures as to which Plaintiffs own the copyrights or other exclusive interests. *See infra.* Plaintiffs now move to hold the Defendants in contempt for violation of such Final Judgment. Therefore, the Court must determine whether Defendants have violated Plaintiffs' rights under the copyright laws, and whether Defendants are liable for contempt for violation of this Court's prior Orders.

### 1. *Copyright*

■ To prevail on a claim of copyright infringement, Plaintiffs must prove by a preponderance of the evidence (1) that they own valid copyrights in the works at issue and (2) that the Defendants violated Plaintiffs' exclusive right to reproduce, distribute and rent the works under the copyright laws. *See e.g., Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1295–96, 113 L.Ed.2d 358; *Original Appalachian Artworks, Inc. v. Toy Loft Inc.,* 684 F.2d 821, 824 (11th Cir.1982); *United Feature Syndicate v. Sunrise Mold Co.,* 569

F.Supp. 1475 (S.D.Fla.1983); 17 U.S.C. § 501.

■ To satisfy the first prong, the Plaintiffs must prove that the works at issue are original and that the Plaintiffs complied with applicable statutory formalities. *See Bateman v. Mnemonics. Inc.,* 79 F.3d 1532 (11th Cir.1996) (citations omitted). Presentation of the appropriate certificates of registration constitutes prima facie evidence of the validity of the copyrights. *Id.* Once the Plaintiffs produce a certificate of copyright, the burden shifts to the Defendants to demonstrate why the claim of copyright is invalid.

In the present case, Plaintiffs' production of certified copies of thirteen (13) copyright registration certificates obtained from the United States Copyright Office established a prima facie case of the validity of their copyrights to thirteen (13) of the videocassettes at issue.

■ As regards the three (3) remaining videocassettes, the Court has considered Defendants' argument that any evidence that the Defendants may have infringed copyrights held by Time Warner is irrelevant because Time Warner was not properly named as a Plaintiff in this action. As stated at ¶ 4 of the Findings of Fact, *supra*, Warner Bros., a division of Time Warner, was the named party relevant to the three (3) remaining videocassettes. The Court finds this name is and was sufficient to provide the Defendants with notice that the copyrights originally held by Warner Bros. were in issue in this litigation. Moreover, claims based upon the rights related to those three (3) videocassettes were fully addressed at the hearings to the same extent that they were addressed with respect to other thirteen (13) videocassettes. Therefore, the Court may consider the three (3) videocassettes relating to Time Warner, as if Time Warner had been named in the pleadings. *See* Fed.R.Civ.P. 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). Although Defendants have objected to the relevance of copyrights held by

Time Warner, the Court finds that the Defendants were not prejudiced by the admission of evidence at the hearings in support of claims associated with such copyrights, and deems the pleadings amended to conform to such evidence. *See* Fed.R.Civ.P. 15(b). The Court notes that Time Warner is the real party in interest as to the three (3) remaining videocassettes at issue pursuant to the Second Restated Assignment cited at ¶ 4 of the Findings of Fact, *supra*. *See* Fed. R.Civ.P. 17(a) ("Every action shall be prosecuted in the name of the real party in interest ... No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder *or substitution* of, the real party in interest ..."). Accordingly, Plaintiffs' production of certified copies of the three (3) copyright registration certificates obtained from the United States Copyright Office by Warner Bros., in addition to the evidence of the assignment by Warner Bros. of its rights to Time Warner, established a prima facie case of the validity of Plaintiffs' copyrights to those three (3) videocassettes at issue.

Therefore, the burden of production shifted to the Defendants to introduce evidence of invalidity of the Plaintiffs' copyrights. *See, e.g., Original Appalachian Artworks, Inc. v. Toy Loft Inc.,* 684 F.2d at 826; *American International Pictures, Inc. v. Foreman,* 576 F.2d 661 (5th Cir.1978); *Tennessee Fabricating Co. v. Moultrie Manufacturing Co.,* 421 F.2d 279 (5th Cir.1970). *See also, Blendingwell Music, Inc. v. Moor–Law, Inc.,* 612 F.Supp. 474 (D.Del.1985); *Fourth Floor Music, Inc. v. Der Place, Inc.* 572 F.Supp. 41 (D.Neb.1983); *Boz Scaggs Music v. KND Corp.,* 491 F.Supp. 908 (D.Conn.1980); *Broadcast Music, Inc. v. Moor–Law, Inc.,* 484 F.Supp. 357 (D.Del.1980); *Goldman–Morgen, Inc. v. Dan Brechner & Co.,* 411 F.Supp. 382 (S.D.N.Y.1976).

Defendants introduced no evidence to question the validity of Plaintiffs' copyrights in the sixteen (16) films other than the arguments discussed, *supra*, regarding the three (3) videocassettes originally copyrighted by Warner Bros. Therefore, as a matter of law, Plaintiffs have met their burden in proving ownership.

■ Thus, at this point, the focus turns to the second prong of Plaintiffs' case of infringement, violation of Plaintiffs' rights by the Defendants. Plaintiffs' copyright registrations give Plaintiffs the exclusive right to reproduce, distribute and sell videocassette tapes of the movie titles at issue in this litigation. 17 U.S.C. § 106. The Court finds that Defendants infringed Plaintiffs' rights in the titles at issue in this litigation by renting counterfeit videocassette tapes without Plaintiffs' authorization to do so. 17 U.S.C. § 501. Plaintiffs need not demonstrate knowledge or intent on the part of the Defendants. *See, e.g., Fitzgerald Publishing Co., Inc. v. Baylor Pub. Co.,* 807 F.2d 1110 (2d Cir.1986); *Pinkham v. Sara Lee Corp.,* 983 F.2d 824 (8th Cir.1992); *Pye v. Mitchell,* 574 F.2d 476 (9th Cir.1978).

As the Court finds that Defendants have violated Plaintiffs' rights in the motion pictures at issue here, it follows that Defendants are in direct violation of this Court's Consent Decree and Final Judgment dated August 4, 1994, which permanently enjoined Defendants from:

(a) manufacturing, duplicating or performing publicly, without authorization, any motion picture as to which any Plaintiff holds legal or beneficial ownership of the copyright or other exclusive interest; (b) in any manner infringing or contributing to or participating in the infringement by others of any copyright or other exclusive interest owned by any Plaintiff in, for or to any motion picture; or (c) acting in concert or confederacy with, or aiding or abetting others to infringe in any way any copyright or other exclusive interest owned by any Plaintiff.

Accordingly, the question arises as to whether Defendants may be held liable in contempt for violating the Court's Order.

### 2. *Contempt*

■ This Court is empowered by 18 U.S.C. § 401 to punish parties who violate its orders, injunctions and judgments. "A party seeking civil contempt bears the initial bur-

**602**

den of proving by clear and convincing evidence that the alleged contemnor has violated an outstanding court order." *CFTC v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir.1992). Upon a prima facie showing of a violation, the burden of production shifts to the alleged contemnor to defend his or her failure to comply by showing that, although he or she may have taken all reasonable steps to comply, he or she was unable to comply. *U.S. v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552–53, 75 L.Ed.2d 521 (1983). If the alleged contemnor makes a sufficient showing, the burden shifts back to the party seeking contempt who bears the ultimate burden of ability to comply. *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 984 (11th Cir.1986), *cert. denied*, 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986).

■ As stated above, the Plaintiffs successfully established that Defendants infringed on the rights of Plaintiffs by knowingly and willfully renting and holding out for rental counterfeit videocassette tapes to the public for financial gain and that such infringement amounts to a direct violation of this Court's prior Order. *See e.g., United Feature Syndicate Inc. v. Sunrise Mold Co. Inc.*, 569 F.Supp. at 1480. 17 U.S.C. § 504(c)(2). Accordingly, the Plaintiffs satisfied their initial burden, and the burden of production shifted to the Defendants to show that they were unable to comply. In satisfying their burden, the Defendants must make more than "a mere assertion of inability" and introduce evidence supporting their claim. *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir.1984); *Citronelle–Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297 (11th Cir.1991). Defendants must demonstrate that they have made "in good faith all reasonable efforts to comply." *U.S. v. Ryan*, 402 U.S. 530, 534, 91 S.Ct. 1580, 1583, 29 L.Ed.2d 85 (1971).

■ Defendants presented evidence that Defendant Eduardo Celorio took steps to prevent the placement of videocassettes which have not been inspected by him in inventory available for rental. He has indicated that he sets aside and inspects videocassettes before making them available for rental, and that he has instituted a new numbering system in the store for keeping track of those cassettes which have been inspected by him. Nevertheless, Defendant Eduardo Celorio asserts that the instructions from the MPAA are confusing, and it is, therefore, virtually impossible for him to comply.

The Court rejects Defendants' evidence of their inability to comply with this Court's Orders enjoining them from infringing Plaintiffs' rights. The Defendants have been instructed on three occasions regarding ways to avoid unauthorized videocassettes. Those instructions included assistance in identifying counterfeit videos by appearance and directions to purchase videos only from legitimate sellers. Defendants continue to violate the Court's Orders and to hold unauthorized videocassettes which differ in appearance from legitimate videocassettes out for rental to the public, and Defendant Eduardo Celorio testified that he continues to purchase videocassettes from individuals who sell products out of their cars and who can only be contacted by beeper. Therefore, the Court finds that the Defendants have failed to carry their burden of production. Moreover, even if Defendants' efforts were accepted by this Court as sufficient to carry their burden of production, the Court finds that Plaintiffs have carried their ultimate burden of proving that the Defendants are able to comply and have failed to take every reasonable step to do so.

### 3. *Silvia Celorio*

Defendants argue that Defendant Silvia Celorio should not be held liable in contempt in the event that the Court finds that the Defendants have violated its prior Orders. Silvia Celorio is the Director and sole shareholder of Video 47 and works from time to time at the cash register in the store. Defendants assert that she is not liable because she was not responsible for purchasing, selecting or inspecting the videocassettes nor did she exercise any control over the selection of which videocassettes would be made available for rental. The Court points out that Defendant Silvia Celorio has been named in and was aware of the three (3)

prior Orders in which judgment was entered against these Defendants and in which Silvia Celorio was named as a Defendant. *See* n. 1, *supra*. Moreover, as the Defendants have routinely pointed out in oral argument and in their memoranda to the Court, the issue now before the Court is whether the Defendants have violated this Court's prior Orders enjoining the Defendants from infringing on the Plaintiffs rights in the materials at issue.

 "An individual, including a corporate officer, *who has the ability to supervise infringing activity and has a financial interest in that activity,* or who personally participates in that activity is personally liable for the infringement." *Southern Bell Tel. & Tel. v. Assoc. Telephone Dir.*, 756 F.2d 801 (11th Cir.1985) (emphasis added) (citations omitted). In Southern Bell, plaintiffs sought injunctive relief against the defendant company for copyright infringement and other claims for copying and soliciting business from plaintiffs telephone directories. The defendant directors had hired and contracted with a third party who "alone actually performed the photocopying and supervised the preparation and mailing of defendants' solicitation as an independent contractor." *Id.* at 811. The court held that the company and the directors were liable for copyright infringement as the had a financial interest in the infringing activity and the *right to supervise* the sub-contractor's activities, stating, "Liability falls on all of them even if they were ignorant of the infringement." *Id.* at 811 (*citing Gershwin Publishing Co. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971)). The Court adopts the Eleventh Circuit's conclusion in *Southern Bell* on the facts now before the Court and finds that Silvia Celorio, who clearly knew of the Court's prior Orders and the fact that she, her son and her store, had all·been cited for prior infringements of Plaintiffs' rights under the copyright laws, is liable for copyright infringement as to the videocassettes at issue here and, therefore, is liable in contempt for violation of this Court's prior Orders enjoining the same.

### 4. *Statutory Damages*

Where the behavior which violates the Court's Order involves copyright infringement, the Court may impose compensatory fines to be paid to the damaged party based upon the statutory damages provisions of the Copyright Act, 17 U.S.C. § 504(c). *See, e.g., CBS v. Pennsylvania Record Outlet,* 598 F.Supp. 1549, 1557–1559 (W.D. Pa.1984). Pursuant to § 504(c)(1), at any time before judgment is rendered, the plaintiff may elect to recover an award of statutory damages, instead of actual damages and profits, in a sum of not less than $500 and not more then $20,000 for each infringing work. However, where the plaintiff sustains the burden of proving, and the court finds, that the infringement was committed willfully, the court may increase the award of statutory damaged to a sum of not more than $100,000. § 504(c)(2).

 In determining the measure of statutory damages to be awarded, courts consider the following factors: expenses saved and profits gained by the defendants in connection with the infringements; revenues lost by plaintiffs as a result of defendants' conduct; and the infringer's state of mind, that is, whether willful, knowing, or merely innocent. *Morley Music Co. v. Cafe Continental, Inc.,* 777 F.Supp. 1579 (S.D.Fla.1991). Moreover, the court should consider the purposes of the Copyright Act, including restitution to prevent unjust enrichment, reparation of injury, and deterrence of further wrongful conduct by the defendants and others. *Nintendo of America, Inc. v. Ketchum,* 830 F.Supp. 1443 (M.D.Fla.1993). As noted above, the court may increase statutory damages on the grounds that the infringement was willful. *See* § 504(c)(2). For purposes of § 504(c)(2), willfulness may be actual or constructive and may be proven directly or may be inferred from the defendants' conduct. *See N.A.S. Import Corp. v. Chenson Enterprises, Inc.,* 968 F.2d 250 (2d Cir.1992). "An award of 'substantial damages, well in excess of appropriate licensing fees,' is appropriate where the Defendant 'repeatedly violates copyright laws despite actual knowledge of their licensing requirements.'" *Morley Music Co.,* 777 F.Supp. at 1583 (*citing Coleman v. Payne,* 698 F.Supp. 704, 708 (W.D.Mich.1988)).

The Plaintiffs in the matter now before the Court have elected to receive and are entitled to receive statutory damages pursuant to 17 U.S.C. § 504(a) and (c). The Court finds that the Plaintiffs successfully established that Defendants willfully infringed on the rights of Plaintiffs by knowingly renting counterfeit videocassette tapes to the public for financial gain despite repeated warnings from Plaintiffs and the MPAA and in contravention of this Court's prior Orders specifically enjoining such conduct. Furthermore, the record in this and other matters involving these Defendants reflects that Plaintiffs will continue to be damaged by Defendants' conduct despite three Court Orders and final judgments against the Defendants, and substantial damages are warranted in order to prevent further infringing conduct by the Defendants.

Accordingly, the Court finds that the Plaintiffs are entitled to an award of $50,000.00 per title for each of the sixteen (16) counterfeit videocassettes for a total of Eight Hundred Thousand Dollars and no/100 ($800,000.00) in statutory damages. 17 U.S.C. § 504(c).

Pursuant to 17 U.S.C. § 505, the Court may award to Plaintiffs' attorneys' fees and costs incurred in investigating Defendants' continuing activity, proceeding with the fourth seizure at Defendants' store and in initiating and prosecuting this contempt proceeding. Based upon the foregoing conclusions, the Court finds that Plaintiffs are entitled to such reasonable attorneys' fees and costs. *See, e.g., Ford Motor Co. v. B & H Supply, Inc.,* 646 F.Supp. 975 (D.Minn.1986); *Lauratex Textile Corp. v. Allton Knitting Mills, Inc.,* 517 F.Supp. 900, 904 (S.D.N.Y. 1981). The Court reserves ruling on the amount of attorneys' fees and costs at this time.

Finally, Defendants are enjoined permanently from infringing Plaintiffs' copyrights, and Defendants are warned that further violations of Plaintiffs' copyrights will lead to further damages including injunctive remedies preventing Defendants from owning, operating, participating in or having any interest in any video store. 17 U.S.C. § 502

## CONCLUSION

Based on the foregoing facts and conclusions, it is hereby

ORDERED AND ADJUDGED that Plaintiffs' prayers for injunctive relief and statutory damages, damages for wilful infringement, attorneys' fees and costs in this action are GRANTED. It is further

ORDERED AND ADJUDGED that Final Judgment is hereby entered in favor of the Plaintiffs consistent with the above findings and in the amount of $800,000.00 for which let execution issue as follows:

Defendants shall pay statutory damages in the amount of $800,000.00 to Plaintiffs.

Defendants are permanently enjoined from infringing Plaintiffs' copyrights as set forth herein. It is further

ORDERED AND ADJUDGED that the Court reserves jurisdiction to award payment by the Defendants of Plaintiffs' reasonable attorneys' fees and costs. Plaintiffs shall file an application for attorneys' fees and costs accompanied by the requisite documentation of the same within ten (10) days of the date of this Order.