**BLENDINGWELL MUSIC, INC., et al., Plaintiffs,**

v.

**MOOR–LAW, INC. and Robert C. Moor, Jr., Defendants.**

Civ. A. No. 82–739 CMW.

United States District Court, D. Delaware.

Feb. 1, 1985.

476

Jane R. Roth, of Richards, Layton & Finger, Wilmington, Del., for plaintiffs; Ross J. Charap, New York City, of counsel.

Robert C. Moor, Jr., pro se.

## MEMORANDUM OPINION

CALEB M. WRIGHT, Senior District Judge.

Plaintiffs have moved for summary judgment in their action for copyright infringement. The action alleges that the defendants acquiesced in, assisted in, and benefited from the unauthorized public performance of copyrighted musical compositions. The plaintiffs are music publishers and members of the American Society of Composers, Authors and Publishers (hereinafter "ASCAP"). ASCAP itself, however, is not a party to this lawsuit, although it took fundamental responsibility for gathering the evidence for plaintiffs' action. Defendant Moor-Law, Inc. (hereinafter "Moor-Law") was the proprietor of the Triple Nickel Saloon (hereinafter "Triple Nickel"), the location of the alleged unauthorized public performances. The other defendant, Robert C. Moor, Jr. (hereinafter "Moor"), was the sole stockholder and sole corporate officer of Moor-Law at the time of the alleged infringements.

## FACTS

The Court derives the facts in this action from the record as it stands. The plaintiffs have submitted voluminous evidentiary material to accompany their Motion for Summary Judgment. *See* Plaintiffs' Opening Brief.[1] The evidentiary material consists of five exhibits[2] (each exhibit is divided into three parts, containing an affidavit and supporting material) and an appendix in six sections[3] (only three of the six sections purport to augment the factual record in this case).

Defendants have not submitted any evidentiary material for the record. In fact, the only response to plaintiffs' motion by defendants was a three page document submitted by defendant Moor and captioned "Defendants [sic] Argument to Plaintiffs [sic] Motion and Alternative Motion for Dismissal"[4] (hereinafter "Moor's Answering Brief"). At best, Moor's Answering Brief could be considered an unsworn statement by Moor.

In addition, the Court has been able to glean additional information from two documents in the Court's file: Moor's deposition[5] (hereinafter "Moor Dep.") and Plaintiffs' Answers and Objections to Interrogatories[6] (hereinafter "Plaintiffs' Answers").

Moor-Law was incorporated in 1974. Moor Dep. p. 2. At the time of its incorporation, it had only two stockholders, Moor and Teddy Lawson. Within six months all shares had been transferred to Moor. Moor Dep. p. 6. Moor was the only corporate officer after this time, serving in the capacity of President of Moor-Law.

Originally Moor-Law operated an establishment known as "The Club" on the premises that the Triple Nickel came to occupy. Sometime in 1976, The Club went

1. Docket No. 21.

2. Citations to these exhibits will be designated as "Exhibit _____."

3. Citations to the various sections of the appendix will be designated as "Appendix Tab _____."

4. Docket No. 22.

5. Docket No. 18.

6. Docket No. 15.

out of business and was replaced by the Triple Nickel, another establishment owned and occupied by Moor-Law.

The Triple Nickel was a bar and restaurant that provided music for the entertainment of its patrons. Moor Dep. p. 15. An outdoor sign prominently displayed that the establishment featured live country music. Moor Dep. p. 20. Occasionally, the bar advertised its featured artist in local media when the artist was of national repute. Moor Dep. p. 21.

The Triple Nickel at the time of each of the alleged infringements had a manager. The manager oversaw the general operations, which included booking local groups to provide music, Moor Dep. p. 26, negotiating artists' fees of less than two or three hundred dollars a night, and making occasional disbursements out of petty cash. Moor Dep. p. 12.

Moor, however, maintained an active role in supervising the Triple Nickel's operations. He hired the managers, Moor Dep. p. 13, and on one occasion was forced to fire a manager. Moor Dep. p. 13. He made clear to each of his managers that only country and western music was to be played. Moor Dep. p. 23. Moor made the decision when to charge an admission fee for certain performers. Moor Dep. pp. 16, 25. Along with his manager, he scouted local bands to determine whether they were suitable for performing at the Triple Nickel. Moor Dep. pp. 32–33.

Moor was the only individual with authority to sign checks during the period in question. Moor Dep. pp. 8, 11. Perhaps his most significant duty was scheduling the appearance of and negotiating the fee for artists of national stature. Moor Dep. pp. 26–27. His daily attendance at the business varied; sometimes he was there nightly for a month, followed by periods of absence. Moor Dep. p. 28.

Moor has never procured a license to perform copyrighted materials from either ASCAP or members of ASCAP with regard to material for which ASCAP holds a non-exclusive license. ASCAP has always believed that unauthorized public performance, either from live performances or from a jukebox, have taken place, first at The Club, and then at the Triple Nickel. ASCAP has repeatedly encouraged Moor to obtain a license with them as evidenced by correspondence and business records detailing telephone conversation as well as personal visits to his establishment. See Exhibit 1.

Failing in its efforts to get Moor to take a license, ASCAP hired independent agents, each of whom had had musical training, to determine whether copyrighted material for which ASCAP held a non-exclusive license was being performed either live or on a jukebox. On two consecutive evenings, November 16 and 17, 1979, Dawn S. & Donald H. Hood went to the Triple Nickel as paid listeners for ASCAP. See Exhibits 3 and 4. Like the other patrons, they were required to pay an admission fee. They witnessed the performance of twelve compositions that the plaintiffs contend were copyrighted and played without authorization.[7]

On the evenings of January 9 and 17, 1981, D.W. Hart went to the Triple Nickel as a paid listener of ASCAP. See Exhibit 2. He paid an admission charge each evening. He witnessed the performance of six compositions that the plaintiffs contend were copyrighted and played without authorization.[8]

---

**7.** The twelve compositions and the dates of the alleged infringements are as follows: November 16, 1979—Hound Dog (L), Just When I Needed You Most (L), Slow Dancing (A/K/A Slow Dancer) (L), Little Things Mean A Lot (L), Play That Funky Music (L), Tulsa Time (J), You Decorated My Life (L), and He's So Fine (L); November 17, 1979—Orange Blossom Special (J), She Believes In Me (A/K/A While She Lays) (L), Color My World (L), and You Never Even Call Me By My Name (J). "(L)" denotes a live performance and "(J)" denotes a jukebox performance.

**8.** The six compositions and the dates of the alleged infringements are: January 9, 1981—Bad, Bad Leroy Brown (L), Blue Eyes Crying In The Rain (L), My Girl (L); January 17, 1981—Jailhouse Rock (L), Lookin' For Love (L), Lady (L).

On the evening of June 6 and through the early morning of June 7, 1982, D.W. Hart accompanied by Michael Bailey were in attendance at the Triple Nickel. *See* Exhibits 2 and 5. Each paid an admission charge. The two witnessed the performance of three compositions that the plaintiffs contend were copyrighted and played without authorization.[9]

The plaintiffs have provided the Court with copyright certificates of registration of each of the twenty-one compositions that they allege were played without authorization. *See* Appendix Tab F.

### THE STANDARD FOR REVIEW

On a motion for summary judgment, the Court must initially determine whether a genuine issue of material fact exists. Fed. R.Civ.Proc. 56(c); *Peterson v. Lehigh Valley District Council, United Brotherhood of Carpenters and Joiners*, 676 F.2d 81, 84 (3d Cir.1982). No issue of material fact exists, if after drawing all inferences from the existing record in a light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

These well-established principles apply equally to situations in which the parties contest every fact alleged in a case and to situations, as here, in which the non-moving party has failed to offer any evidence in support of his defenses or counterclaims. This case resembles the latter situation, and thus, the primary issue for the Court is whether there are sufficient facts in the record to support a finding of copyright infringement.

To withstand summary judgment, the non-moving party bears the burden of producing evidence in support of his allegations and denials when the record is devoid

of such evidence if his allegations or denials are to be resolved in his favor. Fed.R. Civ.Proc. 56(e). This burden of production, however, can be satisfied by evidence introduced by either party which tends to corroborate the non-moving party's allegations or denials. In spite of the risk of an adverse judgment to a non-moving party in failing to offer any evidence, the moving party retains the burden of initially demonstrating the absence of any genuine issue of material fact, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Spirides v. Reinhardt*, 613 F.2d 826 (D.C.Cir.1979), and only then is the non-moving parties' burden of production relevant.

### THE COPYRIGHT INFRINGEMENT CLAIM

A copyright confers on its owner exclusive right, subject to express limitations, to perform or to authorize performance of copyrighted works. 17 U.S.C. §§ 106 *et seq.* A violation of the copyright owner's exclusive right over copyrighted materials constitutes infringement for which the copyright owner is entitled to seek legal and statutory remedies against the infringer. 17 U.S.C. §§ 501 *et seq.*

■ The plaintiffs allege that the unauthorized performance of the twenty-one compositions either by live bands or on the Triple Nickel's jukebox infringed their copyrights and that Moor-Law and Moor should be liable for these acts of infringement. Plaintiffs are entitled to summary judgment only if they can demonstrate the absence of any disputed facts with respect to the five requisite elements for copyright infringement:

    1. the originality and authorship of the songs allegedly infringed;

    2. compliance with the formalities of the Copyright Act;

---

**9.** The three compositions are: Third Rate Romance (L), Tight Fittin' Jeans (J), and Wasn't That A Party (L). The Court notes, however, that Third Rate Romance was not correctly identified in the reports of either party. Instead, it was referred to as "Low Rent Rendezu-

ous," a phrase from the song. Mr. Bailey's report has Third Rate Romance written in a different penmansship next to Low Rent Rendezvous. Both parties contend in their affidavits that they actually heard Third Rate Romance.

3. that plaintiffs are the proprietors of the copyrights;

4. the compositions were performed publicly as alleged and for profit; and

5. that such performance was without proper authorization.

*E.g., Shapiro, Bernstein & Co. v. Log Cabin Club Association,* 365 F.Supp. 325, 328 n. 4 (N.D.W.Va.1973) (discussing essential elements of contributory infringement prior to recodification of Copyright Act in 1976); *Broadcast Music, Inc. v. Moor-Law, Inc.,* 484 F.Supp. 357, 362 (D.Del.1980) (*Moor-Law I*). *See generally* 3 M. Nimmer, *Nimmer on Copyright* § 12.11 (rev. perm. ed. 1984).

Because registration certificates of copyright constitute prima facie evidence of originality, authorship, and compliance with statutory formalities, 17 U.S.C. § 410(c); *Moor-Law I, supra,* 484 F.Supp. at 362, plaintiffs' uncontested submission of copies of the copyright certificates of the twenty-one compositions in question is sufficient to establish the first two elements. *See* Appendix Tab F.

■ The third element requiring proof of proprietorship of the copyright is sometimes referred to as chain of title. Chain of title is no more difficult to establish than the first two elements whenever the plaintiff is the author of the copyrighted composition or whenever plaintiff was the original claimant to the copyright; in either case, the certificates of copyright are sufficient to shift the burden of proof to the defendant to disprove proprietorship. *Nimmer, supra,* at § 12.11[c]. For slightly less than half of the compositions in question, plaintiffs' certificates alone provide adequate proof of proprietorship. In the remaining cases, which involve plaintiffs who are the assignees of a previously registered copyright, plaintiffs have satisfied their burden by producing copies of assignments between the original claimant and the plaintiff to establish the existence of a chain of title showing proprietorship.

■ In two cases, plaintiffs have failed to carry their burden of establishing proprietorship. With respect to the composition entitled, "Little Things Mean A Lot," the plaintiff, Robbins Music Corp., is not the original claimant on the registration certificate. Consequently, Robbins is required to submit documentary evidence of its chain of title which it has failed to do. In addition, T.B. Harms Co., another plaintiff, has failed to provide any documentary evidence of its relationship to Bibo Music Publishers, the claimant on the certificate of registration to the composition, "Tulsa Time." Because the owners of "Tulsa Time" and "Little Things Mean A Lot" have failed to make a prima facie showing of proprietorship, as to these works that were allegedly infringed, they are not entitled to summary judgment on their infringement claims.

■ The fourth element to an infringement claim requires proof of a performance of the copyrighted work, which if unauthorized, would violate the exclusive right of the copyright owner. In all but one of the alleged acts of infringement,[10] ASCAP's agents have presented uncontroverted evidence that the compositions were performed at the Triple Nickel on the specific dates alleged. Moreover, the music performed was an integral aspect of the Triple Nickel's business operations. Music, as Moor pointed out, was provided for the entertainment of customers. Admission charges were levied on each of the evenings that ASCAP's agents gathered evidence of infringement.

■ Some question might be raised whether the performance of copyrighted material on the Triple Nickel's jukebox gives rise to an action for infringement in light of the limitations on the copyright

---

**10.** The one instance in which some question of proof of performance exists is the reports of Hart and Bailey originally identified Third Rate Romance as Low Rent Rendezvous. Although the latter is a phrase in the song, the misidentification of the title raises some question as to the party's familiarity with the composition. Therefore, the Court finds that even with defendants' silence, summary judgment should not be granted on the alleged infringement of Third Rate Romance.

owners exclusive right contained in 17 U.S.C. § 116. The Triple Nickel, however, by charging an admission fee is excluded from the terms of that limitation. 17 U.S.C. § 116(e)(1)(B). The fact that the admission fee was meant as a charge for the live music rather than as a charge to use the jukebox is immaterial to the liability of the establishment's owner in which the jukebox was located. *See Stewart v. Southern Music Distributing Co.,* 503 F.Supp. 258, 259 (M.D.Fla.1980) (holding lounge owner liable for contributory infringement when jukeboxes were the source of infringing performances in a lounge that charged a fee); *Quackenbush Music, Ltd. v. Wood,* 381 F.Supp. 904, 905 (M.D.Tenn.1974).

■ The final element for infringement is beyond dispute in this case. Plaintiffs allege that they never authorized performances of the works. William Fielder, an employee of ASCAP, has submitted an affidavit that Moor and Moor-Law refused to purchase a license from ASCAP. Moreover, Moor appears to concede that he needed a license. Moor Answering Brief at 1. The Court feels that once a lawful proprietor of a copyright alleges that a performance of a copyrighted work was unauthorized, the burden shifts to the defendants to show a genuine issue of fact exists that the performance was authorized. In this particular case, plaintiffs have gone further, they have established a strong evidentiary basis for concluding that the defendants actually refused licenses. Thus, in eighteen of their claims, the Court finds plaintiffs have demonstrated that copyright infringements occurred.

■ There can be no issue as to Moor-Law's liability as a direct or contributory infringer. Moor-Law, as proprietor of the Triple Nickel, hired live bands and operated the jukeboxes. Thus, Moor-Law is responsible under the normal agency rule of *re-spondeat superior. Famous Music Corp. v. Bay State Harness Horse Racing & Breeding Association,* 554 F.2d 1213, 1214–15 (1st Cir.1977) (rejecting defendant's claim that it should not be held responsible for infringing acts of musicians it hired who were independent contractors); *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (2d Cir.1963); *accord, KECA, Music, Inc. v. Dingus McGee's Co.,* 432 F.Supp. 72, 74–75 (W.D. Mo.1977) (holding defendant liable for infringing acts of musicians who had been instructed to perform only original compositions); *see also Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 157, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975) ("The enterpreneur who sponsors such a public performance [live musicial performances] for profit is also an infringer.") (dictum).

## PERSONAL LIABILITY OF MOOR

Plaintiffs also contend that Moor himself is liable to them for copyright infringement. Defendant Moor disavows any liability on his part. He characterizes his participation as "vicarious" at best.[11] Moor Answering Brief at 1. Although this characterization of his participation is surely a sufficient basis for affixing liability, *see Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307, 309 (2d Cir. 1963) (imposing "vicarious" liability for infringement on corporate entity for acts of its franchisee), the Court must independently review the facts in the record which would provide a basis for the imposition of vicarious liability.

As discussed earlier, Moor may not have been present at the Triple Nickel at the time of the acts of infringement, and thus, this Court must assume for purposes of summary judgment that he was not. Moreover, Moor's deposition clearly indicates that he delegated some authority

11. Moor also contends that since Moor-Law is now bankrupt the whole action should be dismissed as moot. Even if the judgment of this Court did not provide the plaintiffs with rights against the debtor's estate, the action is nevertheless *not* moot. If Moor is also liable for copyright infringement, he will be jointly and severally liable for the acts of the other infringer, Moor-Law. *Chappell & Co. v. Middleton Farmers Market & Auction Co.,* 334 F.2d 303 (3d Cir.1964).

with respect to the selection of bands to his general manager. Finally, Moor contends that he was frequently hospitalized for alcoholism during the period in question.

While these factors bear on whether liability should be imposed on Moor, they do not preclude as a matter of law a finding of vicarious liability against Moor. Vicarious liability may be predicated on the right and ability of an individual to supervise activities that may lead to infringement coupled with that individual's direct financial interest in those activities. *See Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir.1963). In addition, "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory infringer.' " *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971) (footnotes omitted). In *Gershwin Publishing*, the Second Circuit affirmed the liability of a concert artist's manager for copyright infringement because he arranged concerts for artists knowing they might give unauthorized performances of copyrighted material.

Corporate officers have been held liable for the copyright infringement committed by their corporate entity in a variety of situations. *See Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531, 537 (S.D.N.Y.1977) (holding officer that negotiated with parties to produce infringing records, oversaw all operations, and had a substantial financial stake in success of infringing venture liable for contributory infringement), *aff'd.*, 592 F.2d 651 (2d Cir.1978); *Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 913 (D.Conn. 1980) (holding corporate vice-president, who was also general manager of radio station, liable for infringing conduct of radio station in view of his responsibility to oversee operations, his direct financial interest in the station, and his failure to take any precautions or to police against infringement); *Warner Bros., Inc. v. O'Keefe*, 468 F.Supp. 16, 19 (S.D.Iowa 1977) (holding sole stockholder, officer and employee of corporation, that operated a bar featuring live and jukebox performances of copyrighted material that were unauthorized, personally liable for copyright infringement).

The facts in this case will not admit to a finding other than that Moor was directly or contributorily liable for copyright infringement. He was the sole stockholder in Moor-Law. Although he did not necessarily oversee operations daily, he nevertheless was aware of the kind of music that was performed and was frequently on the premises. Although he seldom actually hired the local groups that performed at the Triple Nickel, he did scout out such groups. He hired and fired managers to whom the responsibility of negotiating and hiring local groups was delegated. Through repeated complaints from ASCAP, he was aware that copyright infringement was occurring and that he needed a license or licenses as authorization for performance of copyrighted compositions.

Although the exact degree of Moor's control over operations at the Triple Nickel cannot be ascertained on this Motion for Summary Judgment, such a determination is not required in this case. The undisputed facts in the record provide a sufficient basis for finding that Moor was in a position to police activities at the Triple Nickel and failed to do so. Moor's contentions in his unsworn statement go only to the issue of the precise degree of control exercised by Moor but do not rebut the basic finding that Moor exercised more than the minimal degree of control necessary to make him vicariously liable.

LACHES

Moor and Moor-Law raise the defense of laches in their Answer.[12] The basis for the defense is the longstanding

---

12. The assertion of this affirmative defense is couched in what defendants have called Count II of their Counterclaims. *See* Answer of Defendants Moor-Law, Inc. and Robert C. Moor, Counter Claim [sic]. Docket No. 6.

nature of the dispute between defendants and ASCAP, an organization to which all the plaintiffs belong. Although some of the infringed actions occurred more than two years before the filing of the Complaint, the statute of limitations on actions for infringement is three years. 17 U.S.C. § 507(b).

Defendants' attempt to invoke laches is ultimately deficient because it has failed to carry its burden of producing evidence that suggests that plaintiffs' conduct was unreasonable or that it has suffered prejudice as a result of plaintiffs' unreasonable delay in bringing an action. *See Lottie Joplin Thomas Trust v. Crown Publishers*, 592 F.2d 651, 655 n. 4 (2d Cir.1978). Indeed, in view of the high costs of litigation, procuring the voluntary compliance of restaurant and bar owners is far superior to bringing a lawsuit. Given ASCAP's repeated notices of copyright infringement and attempts to have the defendants obtain a license from ASCAP, it is difficult to understand how the defendants could ever have reasonably believed that they were authorized to perform the works in question or that the plaintiffs had somehow abandoned their copyrights. The Court, having adduced no evidence in the record to support the defendants' assertion of laches, must render summary judgment in favor of plaintiffs on this affirmative defense.

## ANTITRUST AND COPYRIGHT MISUSE

■■■ Count I of defendants' self-styled Counterclaims allege that ASCAP's refusal to license on terms other than blanket licenses, or to provide a retroactive license, and its failure to give defendants a list of ASCAP songs constitute copyright misuse on the part of the plaintiffs. At first glance, this claim is rather surprising in that ASCAP is not a plaintiff in this action. Thus, even if ASCAP has misused its non-exclusive license from copyright owners, it is not clear why plaintiffs who are members of ASCAP cannot enforce their exclusive rights to their copyright.

The defendants have not alleged that any of the individual plaintiffs refused their request for a license and even if they had, it is hard to see how a unilateral refusal to license a copyright could constitute misuse; a copyright entails the right to refuse to license.[13] Without even considering the substantive merits of defendants' claim, the Court dismisses this count for failure to state a claim.

■■■ Count III, which incorporates the allegations of Count I of defendants' counterclaims, remedies the inherent pleading defect in Count I: ¶ 9 alleges concerted action among the plaintiffs and plaintiffs' agents which apparently is meant to include ASCAP. The absence of ASCAP as a party does not facially preclude a finding of civil liability against some of the participants in an antitrust conspiracy, based on acts of participants who have not been made a party to the lawsuit. In the absence of any antitrust violation, however, there is no basis for defendants' allegation of copyright misuse. Thus, the Court turns its attention to the antitrust allegations.

■■■ The blanket licenses of ASCAP and Broadcast Music, Inc. ("BMI") have been the subject of repeated lawsuits brought under the antitrust laws. Three decisions since the Supreme Court's determination that ASCAP's and BMI's blanket licenses to a television network were not per se violations of section 1 of the Sherman Act, *BMI, Inc. v. Columbia Broadcasting Systems, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (the *"CBS Case"*), have held that blanket licenses did not violate section 1 under a "rule of reason" analysis. *Columbia Broadcasting System, Inc. v. ASCAP*, 620 F.2d 930 (2d Cir. 1980) (*"CBS-remand"*) (blanket license to television network), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1491, 67 L.Ed.2d 621 (1981); *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir.1984) (blanket license to independent television stations); *BMI v.*

---

**13.** It is important to emphasize that the individual copyright owner's right to refuse to license may not be free from scrutiny once the exclusive rights of a particular copyright owner are pooled with other copyright owners.

*Moor-Law, Inc.*, 527 F.Supp. 758 (D.Del. 1981) (*Moor-Law II*) (blanket license to nightclubs and bars), *aff'd. mem.*, 691 F.2d 490 (3d Cir.1982). These decisions are themselves only the most recent round of antitrust litigation in which the major copyright pools have been involved. It is, however, unnecessary to recount that history today.[14]

Plaintiffs have denied each of the defendants' allegations and claim that the defendants are collaterally estopped from raising any antitrust claims. Plaintiffs contend that the defendants' antitrust challenge to BMI's blanket license in a separate lawsuit precludes a reconsideration of the merits of blanket licenses under the principles of *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). To understand why defensive issue preclusion is unavailable to plaintiffs in this action, it is necessary to review the issues that must be analyzed in evaluating the legality of a blanket license in the wake of the Supreme Court's decision in the *CBS Case* and the issues that were actually decided in *Moor-Law II*.

The *CBS Case* determined merely that the blanket license issued by ASCAP and

BMI were not per se unlawful. Although clearly indicating its belief that the blanket license should be scrutinized under the Rule of Reason, the Court did not address the specific areas of inquiry that should be undertaken by the trial court. The Second Circuit has interpreted the *CBS Case* as requiring a two-pronged analysis into first, whether the blanket license is in fact a restraint of trade and secondly, assuming the blanket license is a restraint of trade, whether the net effect of the blanket license is anticompetitive. *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917, 925 (2d Cir.1984).[15] Judge Stapleton's opinion in *Moor-Law II* focused on the second prong, either assuming *arguendo* that the blanket license was a restraint or implicitly holding that the blanket license was in fact a restraint. *Moor-Law II, supra*, 527 F.Supp. at 767–72. In so doing, Judge Stapleton resolved the lawsuit on factual issues that are not common to the present action,[16] namely, BMI and ASCAP employ different formulas for determining fees under their respective blanket licenses and BMI and ASCAP are different-sized competitors in the song market. The reasonability of ASCAP's license could only be determined after a comprehensive Rule of Reason analysis.

---

**14.** *Buffalo Broadcasting, supra*, 744 F.2d at 922–24 and *Moor-Law I, supra*, 484 F.Supp. at 361–62 (D.Del.1980) contain excellent summaries of the prior antitrust actions involving the two major copyright pools. As a result of this prior litigation, the consent decree entered into by ASCAP forbids certain practices of which the most important is a prohibition on obtaining exclusive licenses. *See United States v. ASCAP*, 1950–51 Trade Cas. ¶ 62,595 (S.D.N.Y.1950) (Amended Final Judgment). The decree does not require ASCAP to issue a per piece license or to provide prospective licensees with a list of all its compositions. Section XIV of the Amended Final Judgment provides, however, that upon written request, ASCAP must inform prospective users whether any compositions specified in such request are in the ASCAP repertory. The defendants have not claimed that the alleged conspiracy violated any of the prohibitions of the Amended Final Judgment. Nor does the Court's inspection of that decree suggest otherwise. Absent allegations of specific violations of the consent decree, the Court will treat allegations alleging antitrust violation as raising issues for *de novo* consideration.

The defendants also allege that the defendants requested a song list from ASCAP and had been refused. No such list existed and the defendants were so advised. Under the Amended Final Judgment in *United States v. ASCAP, supra*, ASCAP is required to make known to prospective users, whether any compositions specified by the user are in the ASCAP repertory. The defendants were advised of this "editing" service. Exhibit 1 (Fielder affidavit and letters dated March 7, 1975, March 19, 1975, January 31, 1979, March 14, 1979).

**15.** The Court expresses no opinion on whether the first prong of the analysis is called for when the product does not possess unique attributes, nor does it express any opinion on the correctness of their analysis.

**16.** Had Judge Stapleton found, instead, that the first prong had not been satisfied, i.e., the blanket license was not a restraint, then the Court may have held that defendants were precluded from raising their antitrust allegations.

■ Although defensive issue preclusion is not available as a defense to plaintiffs, the Court nevertheless has determined that plaintiffs are entitled to summary judgment on defendants' antitrust claim. Defendants have offered only conclusory allegations of conspiracy on the part of the plaintiffs to deny defendants' licenses. The mere fact that ASCAP holds non-exclusive copyright licenses from the plaintiffs is insufficient to infer that a conspiracy exists.

While *Poller v. Columbia Broadcasting, System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), made clear that district courts should grant summary judgment in antitrust actions only sparingly, the Supreme Court has deemed summary judgment appropriate when a party's conclusory allegations of conspiracy remain unsupported after a reasonable opportunity at discovery. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Put simply, there is no rule against summary judgment in antitrust cases. *In re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436, 440 (5th Cir.1982); *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1167 (7th Cir.1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979).

The Court feels that the facts in this case more closely resemble *First National Bank of Arizona* than *Poller*. The case began over two years ago. Since that time both sides have had ample opportunity to take discovery. Defendants' sole discovery request is six pages of interrogatories of which only two and one-half pages contained questions. In response to plaintiffs' summary judgment motion, defendant Moor filed a three-page unsworn statement repeating in part the same conclusory allegations contained in the defendants' Answer. Defendant Moor made no effort to file a Rule 56(f) affidavit requesting additional discovery to forestall summary judgment. Nor did he mention any lack of opportunity to engage in discovery. Accordingly, the Court holds that the defendants have failed to meet their burden under Rule 56(e) which requires them to set forth specific facts showing that there is a genuine issue for trial once a motion for summary judgment has been filed and the record contains evidence that raises doubts as to the veracity of the non-moving parties allegations.

RELIEF

Having prevailed on the greater portion of their Motion for Summary Judgment [17], plaintiffs may be entitled to injunctive relief, statutory damages, costs and reasonable attorneys' fees. *See* 17 U.S.C. § 502(a) (court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of copyright."); 17 U.S.C. § 504(c) (plaintiffs may elect to recover statutory damages in lieu of actual damages and profits; statutory damages to range, in the court's discretion, from $250 to $10,000, and up to $50,000 if infringement is wilful); 17 U.S.C. § 505 (court, in its discretion, may award attorneys' fees and costs to the prevailing party). In this case, plaintiffs have elected to recover statutory damages and have suggested that $1000 for each of the eighteen infringing performances is an appropriate amount of statutory damages. *See* Plaintiffs' Opening Brief at 20. Defendants suggest that, if they are liable, and in light of their current financial distress, only the statutory minimum of $250 should be awarded.

■ In determining statutory damages under 17 U.S.C. § 504(c)(1), courts have wide discretion to set damages within the statutory limits and awards of damages for more than the statutory minimum are frequent. *See, e.g., Milene Music, Inc. v. Gotauco*, 551 F.Supp. 1288 (D.R.I.1982) ($625 per infringement plus costs and attorneys' fees); *Broadcast Music, Inc. v. Tadych*, 203 U.S.P.Q. 506 (E.D.Wis.1979) ($1000 per infringement), *aff'd.*, 676 F.2d

---

17. Plaintiffs have shown that defendants infringed plaintiffs' copyright in eighteen instances. The three remaining instances—with Third Rate Romance, Tulsa Time, and Little Things Mean A Lot—cannot be resolved on plaintiffs' motion.

697 (7th Cir.1982); *Jerry DeNicola, Inc. v. Genesco, Pakula & Co.*, 188 U.S.P.Q. 306 (S.D.N.Y.1975) ($5000 per infringement). Two factors often considered by courts in determining an amount appropriate to vindicate statutory policy are the award's deterrent value and the wilful nature of defendants' infringement. *See, e.g., Milene Music, Inc. v. Gotauco, supra*, at 1296–97. In this case, the evidence shows that defendants have knowingly permitted violations of the copyright laws for a substantial period of time despite ASCAP's persistent attempts to induce defendants to acquire and maintain a license and despite defendants' previous incidents of liability for copyright infringement.[18] *See* Exhibit 1 (Affidavit of William Fielder). Because the evidence indicates that defendants knowingly violated the copyright laws, (indeed two of the infringing acts followed a defeat in another copyright infringement action against the defendants), and he has not been deterred by imposition of liability in previous cases, the Court finds that an award of $500 for each of the eighteen infringing performances is appropriate. The Court will issue an injunction prohibiting defendants from any further unlawful infringement of the musical compositions that the Court has determined were infringed.

## ATTORNEYS' FEES

█ Plaintiffs' counsel also seeks attorneys' fees and expenses in the amount of $3,782.98.[19] The Court will award plaintiffs' costs and reasonable attorneys' fees. *see, e.g., Milene Music, Inc. v. Gotauco,*

*supra*, at 1297–98 (costs routinely awarded to victor in copyright cases and attorneys' fees particularly appropriate in case of knowing infringement), *M.S.R. Imports, Inc. v. R.E. Greenspan Co.*, 574 F.Supp. 31 (E.D.Pa.1983). Under *Lindy I* and *Lindy II*, a district court must first consider the reasonableness of the number of hours spent and the hourly rate charged by counsel. By multiplying the number of hours reasonably spent times a reasonably hourly rate, the Court arrives at a "lodestar" figure. That "lodestar" figure can then be altered to reflect two other factors: the contingent nature of success and the quality of the attorneys' work. After considering these two other factors, the Court can reach a final determination on the reasonableness of counsel's fee request.

█ In this case, the Affidavit of plaintiffs' counsel, Jane R. Roth, indicates that Mrs. Roth spent 21.10 hours on the case and another attorney, Robert J. Katzenstein spent .9 hours. The Court feels that the number of hours is an accurate reflection of the plaintiffs' counsel efficient use of time commensurate with the supervising attorney's experience in the copyright area. The Court, however, has two reservations in the hours presented by Mrs. Roth. First, plaintiffs did not prevail on three of their twenty-one claims of infringement. Thus, the Court feels that it should reduce the number of hours by .7 hours (a reduction by ³⁄₂₁th of Mrs. Roth's total time would overstate the time spent on the individual claims because of the significant economies of scale in bringing an action for twenty-one acts of infringement). Second-

---

**18.** The plaintiffs have asked the Court to find that Moor wilfully infringed other copyrights. The Court believes that a finding of wilfulness requires something more than mere knowledge of infringement. In this particular case, Moor alleges that he thought the plaintiffs had violated the antitrust laws. Although this does not excuse Moor from liability for copyright infringement, it raises a disputed issue regarding wilfulness that can only be resolved at trial. If the defendants decide to prove wilfulness at a trial, the Court will reconsider its damage award.

**19.** Defendants have not as yet been given an opportunity to dispute the reasonableness of the

fee award requested. The Court's inquiry today is entirely preliminary. Should defendants' dispute the provisional fee award in this Opinion, the Court shall hold a hearing and reconsider the matter as provided in the Order filed with this Opinion. The Court sees nothing inconsistent with a preliminary review of the reasonableness of a request for attorneys' fees and the Third Circuit's holdings in *Lindy Bros. Builders, Inc. v. Am. Radiator, etc.*, 487 F.2d 161 (3d Cir.1973) (hereinafter *"Lindy I"*) and *Lindy Bros. Builders, Inc. v. Am. Radiator, etc.*, 540 F.2d 102 (3d Cir.1976) (hereinafter *"Lindy II"*).

ly, the briefs were not as helpful to the Court as they might have been because the lengthy appendix (over 350 pages) was not paginated. The Court was required to sift through numerous unnumbered pages of appendix containing the registration certificates to ascertain whether adequate documentation existed to show chain of title. Any difficulties in presentation are readily understandable because of Mrs. Roth's best efforts to minimize the attorney time spent on the case and because of the absence of an opposing attorney with whom to focus the issues in this case. The Court has decided, however, that the 1.4 hours spent in preparation of Plaintiffs' Reply Brief should be denied. The brief added nothing to plaintiffs' presentation. It does not contain anything that was not contained in the Plaintiffs' Opening Brief. The argument was stated in a mere three partially-filled pages. Thus, the Court reduces the number of hours reasonably spent on this case to 19 hours for Mrs. Roth and still credits Mr. Katzenstein with .9 hours.

The Court considers the hourly rate charged by Mrs. Roth reasonable: her rate of approximately $140 is a fair value for her services in relation to the prevailing market rate for a partner's time in this area. Mrs. Roth's affidavit fails to provide any information about Mr. Katzenstein other than his hourly rate is in excess of $100 per hour. Because the Court knows nothing about Mr. Katzenstein, it will assume that he was a junior associate. A reasonable charge for his services should not exceed $70.00 per hour. Accordingly, the Court finds that $2,602.05 is a reasonable fee for Mrs. Roth's services and $63.00 is a reasonable fee for Mr. Katzenstein's services so that the total "lodestar" figures come to $2,665.05.

The Court does not believe that this "lodestar" figure should be altered in this case since this was not a particularly difficult case and the quality of the attorneys' work was fairly typical. Under *Lindy II*, in considering the "contingent nature of success," the Court should evaluate the

complexity of the case, the probability of defendants' liability, the difficulty of proving damages, the various risk assumed in developing the case, and the delay in receipt of payment for services rendered. *Id.* at 117. Since this was a fairly straightforward copyright infringement action in which there was little doubt as to defendants' liability and few risks assumed in developing the case, the Court does not believe that the "contingent nature of success" justifies an increase in the "lodestar" figure.

Nor does the Court believe that the "quality of the attorneys' work" justifies an increase or a decrease in the "lodestar" figure. Under *Lindy II*, an increase or decrease in the "lodestar" figure because of the quality of the attorneys' work is to be awarded only when "the lawyer discharged the professional burden undertaken with a degree of skill above or below that expected for lawyers of the caliber reflected in the hourly rates." *Id.* at 118. Since the attorneys' work was acceptable and plaintiffs' attorney has obtained a favorable result through the expenditure of a minimum amount of attorney time, there is no justification for increasing or decreasing the "lodestar" figure.

The plaintiffs' attorney has also requested costs in the amount of $807.16 incurred in connection with the representation of this matter. Although the Court thinks these expenses are high, it nevertheless considers them reasonable in light of all the circumstances. The largest expense was for photocopying: $529.05. At $.15 a page, that comes to over 3500 pages of photocopies. Plaintiffs' Opening Brief, however, was 407 pages long (40 pages devoted to argument and the rest devoted to appendices). The per page price is entirely reasonable, and the number of pages was necessitated by the length of the briefs. The Court does wish to point out that lawyers should exercise special care to guard against excessive photocopying as these expenses have come to represent a significant fraction of the cost of litigation.

The award of attorneys' fees in this matter is entirely provisional. If defendants object to the fee award, then the Court will reconsider the matter of fees *de novo.* Moreover, the Court cannot permit an interim award of attorneys' fees. Thus, plaintiffs cannot collect any fees until the Court has disposed of the remaining three claims and the Court has been satisfactorily apprised of whether the plaintiffs wish to bring this matter to trial for a determination of "wilfulness."