**BROADCAST MUSIC, INC., a New York corporation, Plaintiff,**

v.

**John BEHULAK, an individual, and Nancy Beckman, an individual, and Behulak-Beckman, Inc., a Florida corporation, Defendants.**

No. 84–154–CIV–ORL–19.

United States District Court,
M.D. Florida,
Orlando Division.

Aug. 8, 1986.

William C. Dick, Orlando, Fla., Marvin L. Berenson, New York City, for plaintiff.

Elsie T. Apthorp, Winter Park, Fla., for defendants.

## MEMORANDUM OPINION

FAWSETT, District Judge.

This case came before the Court in a non-jury proceeding to determine whether Defendant Nancy Beckman is jointly and severally liable with Defendants John Behulak and Behulak-Beckman, Inc. for copyright infringement under the Copyright Act, 17 U.S.C. § 101, et seq. Following a review of the facts and applicable law, the Court finds that Beckman is not jointly and severally liable for the infringements.

58

*Findings of Facts:*

Plaintiff, Broadcast Music, Inc., is a New York corporation which owns and licenses the performing rights for a large collection of copyrighted music. In its amended complaint, Broadcast Music asserted two counts of copyright infringement against Defendants Behulak-Beckman, Inc., John Behulak and Nancy Beckman, owners of the Pelican Lounge located at 2106 South Atlantic Avenue, Daytona Beach, Florida. In Count I of its amended complaint, Broadcast Music alleged that the Defendants' public performance of twelve musical compositions on August 23, 1983 infringed its assigned public performance rights. In Count II Broadcast Music alleged that in January, 1985, Defendants deliberately and intentionally violated its assigned public performance rights by performing a selection of an additional six musical compositions. On December 5, 1985, the Court granted in part Plaintiff's Motion for Summary Judgment and found Behulak and Behulak-Beckman, Inc. jointly and severally liable for statutory damages of $12,-000.00, attorneys' fees and costs. The issue before the Court is whether Beckman is also jointly and severally liable for the infringements.

In September, 1980, Behulak and Beckman were dating when Behulak, a bartender, expressed his desire to own and operate a bar in Daytona Beach; he had seventeen years experience working in a bar. Behulak found a vacant building designed for a restaurant/bar establishment located at 2106 South Atlantic Avenue, Daytona Beach Shores, Florida. Although Beckman had no experience in the management or operation of a lounge/bar, she agreed to help Behulak finance a business venture as a silent partner because he did not have sufficient capital to invest. For the past nineteen years, Beckman has been self-employed as the sole owner of Beckman School, a day care center in Daytona Beach.

On January 2, 1981, Robinson's of Daytona, Inc. leased the referenced property designed for use as a bar, package store, and cocktail lounge to Behulak and Beckman who signed the lease as individual lessees. (Defendant's Exhibit 1). Beckman contributed about $20,000.00 and a guarantee for initial financing, improvements to the business premises and general operation of the lounge. On February 12, 1981, Behulak and Beckman opened the bar as the "Pelican Lounge."

In the Modification of Business Lease Agreement and Business License Transfer Agreement, dated June 31, 1981, Robinson's of Daytona, Inc. authorized Behulak and Beckman to apply for transfer of its beverage license, Florida St. Beverage License 4–COP74–360 together with accompanying City Beverage License, to Behulak and Beckman for the operation of the Pelican Lounge. (Defendant's Exhibit 1A). As owners of the Pelican Lounge, Behulak and Beckman each completed individual applications for transfer of the beverage license and personal questionnaires for the State of Florida, Department of Business Regulation, Division of Beverage, before obtaining transfer of the alcoholic beverage license 74–00360. (Plaintiff's Exhibits 2, 2A). The Department of Business Regulation, Division of Alcoholic Beverages & Tobacco issued temporary license permits to Behulak and Beckman, jointly. (Plaintiff's Exhibits 2, 2A).

On April 22, 1983, Behulak and Beckman executed an Assignment of Lease which transferred their collective interest in the January 2, 1981, Lease Agreement to Behulak-Beckman, Inc., a Florida corporation. (Defendants' Exhibit 2). Behulak was President, Director and 50% shareholder of Behulak-Beckman, Inc., and Beckman was Secretary/Treasurer, Director and 50% shareholder. Behulak-Beckman, Inc.'s sole purpose was to operate the Pelican Lounge; hence, Behulak and Beckman each owned 50% of the Pelican Lounge.

It is undisputed that Broadcast Music has been assigned the rights to license the public performance of the musical compositions at issue. Also, it is undisputed that the musical compositions are subject to valid copyright. Moreover, it has been estab-

lished that the eighteen musical compositions at issue were performed at the Pelican Lounge. Finally, it is undisputed that the owner of the Pelican Lounge, Defendant Behulak-Beckman, Inc., had not received permission for the performance of the musical compositions.

*Conclusions of Law:*

■ Essentially, Broadcast Music argues that as a Secretary/Treasurer, Director, and 50% shareholder of Behulak-Beckman, Inc., Beckman shared an equal amount of guidance and supervisory control with Behulak in the management of the Lounge and, therefore, is jointly and severally liable. To the contrary, Beckman insists that, in fact, her only contribution to the corporate endeavor was a financial investment and execution of preliminary documents. Behulak was solely responsible for the operation of the Lounge; he "ran the show" completely and excluded her from all management decisions. Consequently, Beckman argues that her lack of participation in the routine operation of the Pelican Lounge did not afford her opportunity to influence and control any copyright infringement activity.

A corporate officer's liability for copyright infringement depends upon his financial interest in the corporation and the extent of his right and ability to supervise infringing activity. "An individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for the infringement." (Cites omitted) *Southern Bell Telephone and Telegraph v. Associated Telephone Directory Publishers,* 756 F.2d 801, 811 (11th Cir.1985). In *Southern Bell,* the court found that an individual who had a financial interest and the right to supervise the infringing activity was liable for the infringement. *Southern Bell,* 756 F.2d at 811.

Broadcast Music urges this Court to apply an "objective" test based upon Beckman's apparent corporate authority as Secretary/Treasurer, Director and 50% share-

holder of the Pelican Lounge. While the Court agrees that typically an individual assuming these positions would be able to influence and control the direction of a corporation, courts have analyzed a corporate officer's potential individual liability under a "subjective" standard by examining the actual extent of his supervisory right and ability to control any infringing activity of the corporation's operation. *E.g., United Feature Syndicate, Inc. v. Sunrise Mold Co., Inc.,* 569 F.Supp. 1475 (S.D.Fla.1983); *Lauratex Textile Corporation v. Allton Knitting Mills, Inc.,* 517 F.Supp. 900 (S.D.N.Y.1981); *Stewart v. Southern Music Distributing Company,* 503 F.Supp. 258 (M.D.Fla.1980).

This analysis is consistent with the legislative history of the Copyright Act, which reflects Congressional intent to find a proprietor vicariously liable only if he actively controlled, operated or supervised the operation of the business performing the infringing activity.

*"Vicarious liability for infringing performances.*

The committee has considered and rejected an amendment to this section intended to exempt the proprietors of an establishment, such as a ballroom or nightclub, from liability for copyright infringement committed by an independent contractor, such as an orchestra laeder [sic]. A well established principle of copyright law is that a person who violates any of the exclusive rights of the copyright owner is an infringer, including persons who can be considered related or vicarious infringers. To be held a related or vicarious infringer in the case of performing rights, a defendant must either actively operate or supervise the operation of the place wherein the performances occur, or control the content of the infringing program, and expect commercial gain from the operation and either direct or indirect benefit from the infringing performance. The committee has decided that no justification exists for changing existing law, and causing a

significant erosion of the public performance right."

H.R.Rep. No. 1476, 94th Cong. 2d Sess. 159 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News, 5659, 5775.

The instant case presents a unique situation where the only two shareholders of a close corporation appear to share equal opportunity to manage the business. Yet, pursuant to their unwritten agreement, they did not share the responsibility of operating the Lounge. Although case law has not squarely addressed this situation, courts have analyzed a corporate officer's potential liability for copyright infringement based upon the extent of his actual control in the business management. Accordingly, the court is guided by the discussion in several cases on this issue.

In *Warner Brothers v. Lobster Pot, Inc.*, 582 F.Supp. 478 (N.D.Ohio 1984), the court applied a two part test to determine whether defendant Haffney, a corporate officer of defendant Lobster Pot Restaurant, was individually liable for the restaurant's copyrighting infringement activity. The court announced the test, which is extracted from the cited legislative history: (1) whether the officer has direct financial interest in the activity, and (2) whether the officer has actual right and ability to supervise the infringing activity. The court found that Haffney satisfied the two prong test. First, Haffney clearly had a direct financial interest in the corporation since he was the sole shareholder, regularly loaned money to the Lobster Pot, personally guaranteed the company's obligations and signed mortgages for the company's property and equipment. Next, the court detailed Haffney's right and ability to supervise the business's operation beyond his capacity as president and sole shareholder of the Lobster Pot.

Haffney admitted that he had "final say" in all matters concerning the restaurant including employment of the day-to-day manager. He also participated in decisions regarding determination of the musical policy. Further, the court found that Haffney's instruction to the manager that no one should play copyrighted music indicated his right and ability to control the infringing activity. Accordingly, because the court concluded that Haffney displayed extensive right and ability to control the daily operation of the restaurant, he was liable for the infringement.

In *Rodgers v. Quest, Inc. and Cantagallo*, 213 USPQ 212 (N.D.Ohio, E.D.1981), the court applied the established two part test and found a corporate vice-president liable for the infringing activity of defendant corporation's radio station, WAQI. The court found defendant Cantagallo's direct financial interest in Quest, Inc. exemplified by his 44% ownership of Quest shares of stock. Next, the court considered Cantagallo's right and ability to supervise the activity of Quest's radio station, WAQI.

The court found that Cantagallo performed executive functions for Quest and WAQI. He participated in the selection of the WAQI manager and admitted he could have exercised authority and control over the station manager in his operations, but he "didn't have time." Additionally, the court found that Cantagallo failed to take any steps to prevent WAQI's broadcast of plaintiff's musical compositions, although he knew they were being broadcast without a license and without consent of the composers. Further, in a letter to Quest president, Cantagallo wrote that he was "resigning as the overseer of the operations of the radio station WAQI as of September 14, 1980." Accordingly, the court found that Cantagallo jointly liable with Quest for copyright infringement.

In *Pickwick Music Corporation, et al v. Record Productions, Inc., et al*, 292 F.Supp. 39 (S.D.N.Y.1968), the court distinguished the individual liability between five people based upon their level of participation in the operation of a record manufacturer which allegedly violated musical copyright infringements by producing and selling a record album. Although the court did not explicitly delineate a specific test, it found that the three people who actively formed and ran the corporation and shared in profits and losses were jointly and severally liable for the infringement.

Conversely, the court found that the two other corporate officers' limited participation in the operation of the corporation exonerated them from liability. These two officers performed ministerial functions such as producing art work and taking telephone orders. The court found that neither of these corporate officers functioned as corporate executives and their roles as officers "in itself, does not make them participants." 292 F.Supp. at 41.

Similarly, in *Hagemeyer Chemical Company, et al v. Insect–O–Lite Company,* 291 F.2d 696 (6th Cir.1961), after finding the defendant corporation liable for unfair competition, the court carefully analyzed defendant Hagemeyer's liability as a corporate officer and shareholder. Hagemeyer testified that his only activity with the company, aside from investing money in it, was placing shipping labels on cartons of the Insect Lights (defendant's product) and shipping them out from the place where he carried on his own separate lumber business. Hagemeyer stored some of the insect lights at his lumber warehouse. The court found that Hagemeyer neither participated in, knew of, planned nor approved the activities which constituted unfair competition. The court found that this limited exposure exonerated him from liability.

Applying the two part test to the instant case, the court finds the first prong clearly satisfied since Beckman provided Behulak with about $20,000.00 to finance and remodel the Pelican Lounge and was a 50% shareholder in the corporation which ran it. Beckman had a direct financial interest in the business.

Next, the Court determines whether Beckman had the right or ability to supervise the infringing activity. Behulak testified that he made all the management decisions, maintained the books, signed all corporate checks and kept the corporate records. Beckman did not possess the checkbook, records or other corporate documents. Behulak completed and signed the corporate income tax returns without discussing them with Beckman, who had no involvement with the Pelican Lounge's operation. Beckman did not participate in the hiring of employees or musicians. She asserted no control or supervision over the operation of the bar. Beckman merely signed the initial documents necessary to start the business pursuant to Behulak's instructions. On two occasions when Beckman tried to exercise some control over the business: (1) when Beckman objected that Behulak spent too much money on remodeling, and (2) when she wanted to sell the bar, Behulak "overruled her," and ignored her requests.

Beckman testified that for seventeen years she has owned and operated Beckman's School. Beckman testified that she was willing to be Behulak's silent partner as owner of the bar in order to help him "get back on his feet." In fact, Beckman testified that she preferred not to be associated with a bar because it appeared to be in conflict with her own business, the school. Accordingly, Beckman testified that she only visited the Lounge a few times and made no effort to participate actively in management decisions. Mr. Keller, Pelican Lounge bartender, confirmed Beckman's assertion that she exercised no control over the bar, and that he received his work instructions from Behulak.[1]

Broadcast Music has failed to support evidence of Beckman's participation in or knowledge of the routine practice and oper-

---

1. Additionally, Broadcast Music argues that Beckman knew about the second set of unauthorized public performances in January, 1985, as alleged in Count II of the amended complaint. Behulak and Beckman jointly admitted that they retained legal counsel after Broadcast Music filed the first one count complaint on February 17, 1984, and that their attorney informed them that public performance of musical compositions at the Pelican Lounge without permission of the owner of those public performance rights was unlawful. (Plaintiff's Exhibit 1, 1A).

Broadcast Music insists, therefore, that Beckman knew about the second set of unauthorized public performances produced in January, 1985.

The Court finds, however, that the evidence does not support this assertion. In her deposition, Beckman testified that the business was licensed by "ASCAP" to perform musical compositions. American Society of Composers, Authors and Publishers (ASCAP) is an unincorporated membership association of music composers, lyric writers and publishers of musical com-

ation of the Pelican Lounge. Broadcast Music has presented evidence of Beckman's financial contribution, her corporate positions, and her signature on various documents and applications necessary to the initial organization of the Pelican Lounge. Although the Court agrees that generally, an interested 50% shareholder, owner and director of a close corporation may have taken greater control in the business operation, in this case the Court is persuaded by the testimony presented which indicates an agreement between the two equal shareholders and directors of the Pelican Lounge that Behulak was solely responsible for the operation, management, and supervision of the Lounge.

The Court readily admits that Beckman's liability for copyright infringement presents a close question; however, on a close call, the Court finds that under the legislative history the established two part test, and the applicable case law the evidence indicates that Beckman's role in the Pelican Lounge did not include her right and ability to control the infringing activity. Hence, Beckman is exonerated from joint and several liability as a vicarious infringer.

### AWARD OF COSTS AND ATTORNEYS' FEES

In the Court's Order of December 5, 1985, which granted in part Plaintiff's Motion for Summary Judgment, the Court explicitly reserved the determination of costs and attorneys' fees until determination of Beckman's liability. Following this nonjury proceeding, Broadcast Music's attorney filed a letter dated July 16, 1986. An affidavit for award of costs and attorneys' fee pursuant to 17 U.S.C. § 505 in the amount of $52,309.65. Defendants, how-

ever, strenuously challenge the requested attorneys' fees as unreasonable.

Pursuant to 17 U.S.C. § 505, the Court may, in its discretion, allow a party to recover full costs and/or reasonable attorneys' fees. The Court recognizes that its discretion in granting attorneys' fees is controlled by the former Fifth Circuit decision in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). *Southern Bell*, 756 F.2d at 813. Applying the *Johnson* factors, the Court finds that an award of $41,887.50 for time expended between July, 1984 through the filing of a Motion for Summary Judgment in September, 1985, is fair and reasonable in light of the prevailing hourly rates and charges for this type of litigation.

Accordingly, the Court awards Plaintiff $42,243.93 for costs and attorneys' fees, calculated as follows:

| | |
|---|---|
| Attorneys' fees | $41,887.50 |
| Costs | 356.43 |
| | $42,243.93. |

---

positions who have granted the right to license public performance of their copyrighted music. Broadcast Music, Inc. and the ASCAP are two of several associations authorized to license copyrighted music. Beckman's understanding of the law and the Pelican's apparent attempt to comply with the license requirements, although incomplete, does not indicate her knowledge that public performances at the Pelican Lounge in January, 1983 violated copyright laws. Furthermore, this general knowledge has no relationship to the issue of her actual control of the operation of the Pelican Lounge.

Also, Beckman denied receipt or knowledge of any correspondence from Broadcast Music notifying of proper licensing requirements prior to public performance of copyrighted music. Beckman testified that her first knowledge of the infringement came from a telephone call from an unidentified "journal" reporter; she dismissed the call as a "joke" from a friend. This experience is insufficient to infer that she had active control and consent to the infringing activity.