**QUARTET MUSIC, et al., Plaintiffs,**

v.

**KISSIMMEE BROADCASTING, INC., and Gus Cawley, Defendants.**

**No. 91–245–Civ–Orl–18.**

United States District Court, M.D. Florida, Orlando Division.

May 19, 1992.

· David Rojero, Blackwell & Walker, Miami, Fla., for plaintiffs.

Shutz & Shutz, St. Petersburg, Fla., for defendants.

## OPINION

KELLAM, District Judge, Sitting by Designation.

This case involves violations of the United States Copyright Act, 17 U.S.C. §§ 101 *et seq.* Plaintiffs are owners of fifteen musical compositions, copyrighted pursuant to the Act. Plaintiffs are also members of the American Society of Composers, Authors and Publishers [ASCAP] to whom they granted a nonexclusive right to license the public performance of such compositions. ASCAP, in turn, entered into a licensing agreement with respect to those and other musical compositions with defendant Kissimmee Broadcasting, Inc., which operates radio station WMJK in Kissimmee, Florida. Defendants, however, failed to abide by the agreement and on December 19, 20, 29 and 30, 1990 played the fifteen pieces on the radio without authorization from plaintiffs. Defendant Augustine Cawley was the corporate officer and owner of Kissimmee Broadcasting at the time the infringements occurred.

Plaintiffs instituted this suit for injunctive and legal relief under 17 U.S.C. §§ 502(a), 504(c) and 505. Specifically, plaintiffs seek an injunction prohibiting further infringing performances, statutory damages of $5,000 for each of the fifteen infringements, totalling $75,000 in damages, and costs and attorneys' fees.

### I.

A nonjury trial was conducted on March 9, 1992. Before the conclusion of the trial, plaintiffs reached a settlement for a $25,-000 with defendant Kissimmee Broadcasting, Inc. Kissimmee Broadcasting was purchased from defendant Cawley by another concern in November 1991. Among other things, this settlement released defendant Kissimmee from paying all licens-

ing fees that might have been due prior to March 9, 1992. Additionally, plaintiffs and Kissimmee agreed to enter into a licensing contract beginning March 10, 1992 for all musical broadcasting from that day onward. The settlement specifically stated "the intent of the parties [is] that the ... claim made against Mr. Cawley as a defendant is not affected by this settlement stipulation and the case against him will continue." Thus, plaintiffs' action remains against defendant Cawley, and is the subject of this Opinion.

The facts at trial revealed that the relationship between ASCAP and defendant Cawley began in 1983 in connection with Cawley's operation of a radio station in Hudson Falls, New York. Without authorization, the station broadcasted copyrighted compositions by members of ASCAP who had granted ASCAP the right to license their public performance. ASCAP threatened suit and Cawley settled the claim and the parties negotiated a retroactive ASCAP license agreement. In August 1986, Cawley purchased a radio station in Vineland, New Jersey, and the station entered into a licensing contract with ASCAP. When Cawley breached the contract by not paying the required license fees, ASCAP terminated the agreement. An infringement suit is pending in federal court in New Jersey.

In October 1986, Cawley, as sole owner of Kissimmee Broadcasting Inc., purchased WMJK radio station in Kissimmee, Florida. Kissimmee Broadcasting subsequently entered into a license agreement with ASCAP on October 15, 1986. Part of Kissimmee Broadcasting's responsibilities under the contract included submitting an annual statement of the station's revenues on report forms provided by ASCAP, so that actual license fees could be computed.[1] WMJK failed to provide a 1987 Annual Report when due. Kissimmee came in partial compliance with the agreement many months later by making certain payments toward adjusted license fees owed to AS-

CAP. However, by March 1989 after some correspondence with defendant Cawley, and full payment of the required fees still wanting, ASCAP notified the station that its license agreement was terminated. Repeated notice was issued to WMJK warning that further broadcasts of material covered by ASCAP would constitute copyright infringement. This suit was then filed. During this time WMJK sent annual reports for 1987 (revised), 1988 and 1989, but all after the licensing agreement had been terminated by ASCAP.

## II.

 To prove a copyright infringement claim, a plaintiff must show: 1) the originality and authorship of the compositions involved; 2) compliance with the formalities of the Copyright Act to secure a valid copyright; 3) a proprietary right in the copyright at issue; and 4) the defendant's public performance of the copyrighted material, not authorized by the plaintiff or its representative. *Morley Music Co. v. Cafe Continental, Inc.*, 777 F.Supp. 1579, 1582 (S.D.Fla.1991); *Van Halen Music v. Palmer*, 626 F.Supp. 1163, 1165 (W.D.Ark.1986); *Sailor Music v. Mai Kai of Concord*, 640 F.Supp. 629, 632 (D.N.H.1986). *See also Almo Music Corp. v. 77 East Adams, Inc.*, 647 F.Supp. 123, 124 (N.D.Ill.1986); *Blendingwell Music v. Moor–Law*, 612 F.Supp. 474, 479–80 (D.Del.1985).

At trial, copies of copyright registration certificates were entered into evidence for the fifteen musical compositions at issue. Under 17 U.S.C. § 410(c) copies of the certificates are *prima facie* evidence of the validity of a copyright. *See Morley Music Co.*, 777 F.Supp. at 1582; *Van Halen Music*, 626 F.Supp. at 1165; *Broadcast Music v. Larkin*, 672 F.Supp. 531, 533 (D.Me. 1987). Defendant Cawley did not contest plaintiffs' ownership of any of the copyrights at trial. Thus, plaintiffs easily proved the first three elements of their copyright claim.

---

**1.** The agreement required the station to calculate estimated license fees on the basis of monthly station revenues, and then at the end of the year, using the annual report, ASCAP would compute the actual fees. The station was either reimbursed or charged extra for any discrepancies between the estimated and actual fees.

The fourth element to their copyright claim was established prior to trial in the defendants' answer to the Complaint. Paragraph twelve states, in part, "[d]efendants admit broadcasting public performances of the compositions indicated on the dates indicated...." Taken with the documentary evidence and testimony of David Hochman, Director of Radio Licensing with ASCAP, it is clear that defendants broadcasted the fifteen compositions without authorization from either the authors themselves or ASCAP as their representative.

■ Even though defendant Kissimmee Broadcasting was liable for the copyright infringements at issue here, defendant Cawley is also personally liable for violations of the Act. Courts have stated that, under the Copyright Act, an individual who is the dominant influence in a corporation, and through his position can control the acts of that corporation, may be held jointly and severally liable with the corporate entity for copyright infringements, even in the absence of the individual's actual knowledge of the infringements. *Southern Bell Telephone and Telegraph Co. v. Associated Telephone Directory Publishers*, 756 F.2d 801, 811 (11th Cir.1985); *Gershwin Publishing Co. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971) (vicarious liability may attach to corporate officers in cases of copyright infringement); *Shapiro, Bernstein & Company v. H.L. Green Company*, 316 F.2d 304, 307 (2d Cir.1963); *Nick-O-Val Music Co, Inc.*, 656 F.Supp. 826, 829 (M.D.Fla.1987); *Morley Music Co., supra* at 1582; *Broadcast Music Inc. v. Behulak*, 651 F.Supp. 57, 59–62 (M.D.Fla.1986); *Fermata International Melodies, Inc. v. Champions Golf Club, Inc.*, 712 F.Supp. 1257, 1262 (S.D.Tex.1989).

Many courts have adopted a two part test to determine whether a corporate officer is liable for copyright infringement under the Act. First, the officer must have the ability to supervise infringing activity and second, the officer must either have a financial stake in that activity or have personally participated in that activity. *Southern Bell, supra* at 811; *Lauratex Textile Corp. v. Allton Knitting Mills, Inc.*, 517 F.Supp. 900, 904 (S.D.N.Y.1981); *United Feature Syndicate, Inc. v. Sunrise Mold, Inc.*, 569 F.Supp. 1475 (S.D.Fla.1983); *Stewart v. Southern Music Distributing Co.*, 503 F.Supp. 258 (M.D.Fla.1980); *Famous Music Corp. v. Bay State Harness Horse Racing and Breeding Association, Inc.*, 554 F.2d 1213, 1215 (1st Cir.1977); *Warner Brothers, Inc. v. Lobster Pot, Inc.*, 582 F.Supp. 478, 482–83 (N.D.Ohio 1984).

In *Southern Bell*, individual defendants were found liable for solicitation of potential advertisers for a telephone directory which infringed on the copyright held by Southern Bell for the Atlanta Yellow Pages. The 11th Circuit concluded that even though the individual defendants did not oversee the day to day operations of the solicitation, they were nevertheless liable because they had a *right* to do so, accompanied with a financial interest in the solicitation activity. 756 F.2d at 811.

In *Warner Brothers*, the individual defendant was the president and principal shareholder of an incorporated restaurant where unauthorized performances of plaintiffs' musical compositions took place. The district court found that the defendant had a substantial financial interest in the offending restaurant as sole shareholder in the corporation. He alone received dividends from the corporation and he regularly loaned money to the restaurant, personally guaranteeing the loans; he also owned the building in which the restaurant operated. The court in *Warner* also found that the defendant had a "right and ability" to supervise the infringing activity. He was president of the corporation, he owned it in full, and had the final say in all matters concerning the restaurant, including the hiring and firing of employees, and the music played at the restaurant. The defendant even testified that he told his employees not to play unauthorized music, which the court took as further evidence of defendant's right to supervise the infringing activity. *Warner Brothers*, 582 F.Supp. at 482–83.

In contrast to the findings of the *Southern Bell* and *Warner* courts, the district court in *Broadcast Music, Inc. v. Behulak* found that the secretary/treasurer, director and fifty percent stockholder of a closely held corporation was not jointly and severally liable for copyright infringement. In *Behulak*, the defendant jointly owned a lounge with her boyfriend. She had no knowledge of the operation of the bar and essentially was a silent partner investing only capital in the corporation. The *Behulak* court distinguished these facts from those in *Warner* and other courts [2] because the defendant, though she had a financial stake in the corporation, neither professed knowledge of the routine operations of the lounge, nor maintained any supervisory capacity over the infringing activity. *Behulak*, 651 F.Supp. at 61–62.

In the case *sub judice*, defendant Cawley admitted in the Answer that he was the president of Kissimmee Broadcasting, but denied that "he had primary responsibility for or exercised active control, direction, or supervision over Station WMJK with regard to the acts complained of." (Answer, paragraph five). In paragraph seven of the Answer, Cawley stated he had "no actual knowledge of any infringing activity, and such knowledge may not be imputed to him merely by virtue of his position at the radio station." Cawley has asserted throughout these proceedings that if any infringement did occur it was innocently committed.

The evidence produced at trial, however, does not support defendant Cawley's assertions. The evidence shows that Cawley began to correspond with ASCAP regarding the station's licensing agreement in 1986. By the end of 1990, Cawley had already been involved in litigation over licensing agreements for at least one other radio station and was well aware of the requirements necessary to fulfill his side of the contract. ASCAP had given the radio station plenty of notice after the termination of the agreement in March 1989, that any public performance of compositions covered by the terminated licensing agreement would constitute copyright infringement. The performance of the fifteen songs at issue in this case did not occur until December 1990.

As president of Kissimmee Broadcasting, Cawley represented the corporation in licensing matters and had a right to supervise the operations of Station WMJK. He negotiated with ASCAP about licensing issues; specifically, he personally communicated with ASCAP employees concerning annual reports to be submitted and monies owed to ASCAP under their agreement. (*See e.g.* Transcript, p. 27, 34, 37, 135). In the Joint Pre-trial Stipulation the defendants state that "Cawley and the Management of WMJK took reasonable and diligent steps to insure that no music subject to an ASCAP licensing agreement was performed during the time in question." Furthermore, the defendants purported in the stipulation that "Cawley, as a controlling person, took appropriate measures to insure that his staff understood that no ASCAP music was to be performed." As in *Warner*, the defendant here admits he supervised the infringing activity, and therefore the first half of the test outlined above is satisfied. Cawley cannot argue that his relationship to WMJK was akin to that of the *Behulak* defendant, who was described as a silent partner.

The facts of this case easily satisfy the second part of the test, as well. Cawley had owned radio stations before WMJK and actively participated in their operations. He had a clear financial interest in the activities of the radio station.

### III.

The fact that Cawley claims he was innocent of any knowing infringement is irrelevant for liability purposes, but becomes an issue when determining the amount of damages, which is the only issue left to decide. The court is of the opinion that the evidence shows Cawley knew he was not in compliance with the licensing agreement in December 1990 when the in-

**2.** *See Rodgers v. Quest, Inc. and Cantagallo,* 213 U.S.P.Q. 212 (N.D.Ohio, E.D.1981); *Pickwick Music Corporation v. Record Productions, Inc.,* 292 F.Supp. 39 (S.D.N.Y.1968).

fringement occurred. The station had been receiving correspondence from ASCAP for some period of time before December 1990 about its default on the agreement, alerting Kissimmee Broadcasting and Cawley of the potential liability if they played copyrighted material. At trial, neither of the defendants advanced any tenable explanations for the unauthorized performance of the fifteen compositions.

Plaintiffs argue that they are entitled to a permanent injunction against defendant Cawley publicly performing the fifteen compositions which are the subject of this suit. Plaintiffs assert an injunction is necessary for copyright infringements "where the defendant exhibits an unfortunate tendency to ignore, from time to time, both ASCAP and the plaintiffs' proprietary rights, and where there exists a substantial likelihood of future infringements." (Plaintiffs' Post-trial Memorandum, p. 18). *See Milene Music, Inc. v. Gotauco*, 551 F.Supp. 1288, 1295 (D.R.I.1982). Since Cawley sold Kissimmee Broadcasting and WMJK in November 1991 and is no longer connected to either organization as a shareholder, officer or employee, the court finds that an injunction would be inappropriate at this time. Therefore, plaintiffs' request for injunctive relief is DENIED.

Plaintiffs also seek statutory damages pursuant to 17 U.S.C. § 504(c)(1) of the Copyright Act. Statutory damages are an alternative to actual damages and profits, and for each infringement a copyright owner may recover from $500 to $20,000.[3] Plaintiffs here seek $5,000 for each violation of the Act, for a total of $75,000 in damages. Plaintiffs concede that the district court may exercise wide discretion in

determining statutory damages,[4] but suggest that factors to be considered may include the expenses saved and profits gleaned by a defendant in regard to the violative activity, the revenues lost by plaintiffs as a result of the infringement, and the defendant's state of mind in broadcasting the unauthorized compositions, whether it be innocent or willful. *Nick-O-Val Music Co.*, 656 F.Supp. at 829; *Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 914 (D.Conn.1980).

In *Nick-O-Val Music*, the defendants, without an ASCAP license and without any other authorization, publicly broadcasted plaintiffs' musical compositions. Defendants avoided $22,000 in license fees, and evidence existed to demonstrate willful infringement—that defendants knew, or should have known, that they faced potential liability for such violations. The *Nick-O-Val Music* court therefore awarded $2,500 in statutory damages for each infringement. *Nick-O-Val Music*, 656 F.Supp. at 829. In *Morley Music, supra,* even though ASCAP had repeatedly discussed licensing opportunities with defendant, he failed to agree to such a license and avoided over $2,500 in licensing fees. *Morley Music*, 777 F.Supp. at 1583. The *Morley Music* court awarded $1,500 per infringement in statutory damages.

In the case at bar, plaintiffs estimate that the unpaid licensing fees from October 1986 through February 1992 are $10,280.[5] However, the estimate was developed without actual revenue data for the years 1990, 1991 and the first two months of 1992. Furthermore, the testimony shows that from 1987 through 1991 the station's annual revenue dropped substantially. In 1987

---

**3.** In the court's discretion, this amount may be increased to no more than $100,000 per infringement where willful infringement is found, pursuant to 17 U.S.C. § 504(c)(2).

**4.** *See F.W. Woolworth Company v. Contemporary Arts, Inc.*, 344 U.S. 228, 231–32, 73 S.Ct. 222, 224–25, 97 L.Ed. 276 (1952).

**5.** Actually, ASCAP estimated that the amount owed in licensing fees from 1986 through February 1992 is $18,199.00. (Transcript, pp. 84–85). David Hochman of ASCAP testified that Kissimmee Broadcasting has paid $7,919.00 of that amount to date, bringing the default down

to $10,280.00. Hochman described what factors were considered in calculating the $18,199.00: "I looked at the revenue applicable for the reported period, the license fees for the subsequent, the unreported period which would be the years 1990 and 1991 and the first two months of 1992, compared that with the amounts of payments that had been received since Kissimmee Broadcasting acquired the station in 1986, what the applicable finance charges would be on the unpaid amounts, and developed an estimate." (Transcript, p. 74).

revenue was about $335,000.00, in 1988 was $245,000.00, and in 1989, the last year for which any annual report was submitted, the revenue was $105,000.00. (Transcript, p. 81). The estimate is strongly contested by Cawley as being based on inaccurate revenues, calculated without proper deductions for bad debt, and on an audit done by ASCAP in 1990 which is replete with error. (Transcript, pp. 88, 99, 103, 107, 120).

Since Cawley sold Kissimmee Broadcasting and with it WMJK in November 1991, he should not be held liable for the nonpayment of license fees from the date of sale through February 1992. The fee estimated for the first two months in 1992 was $364.00. (Transcript, p. 83). The estimated annual fee for 1991 was $2,184.00. (Transcript, p. 81). Since it is not clear when in November 1991 the sale occurred, a deduction for at least December 1991 is proper, which would be $182.00. Thus, defendant Cawley, at most, would be liable to plaintiffs for $9734.00 in licensing fees.

License fees avoided by defendants and profits gained are but two factors involved in determining statutory damages. Another consideration is Cawley's state of mind in broadcasting the music without authority. While the court has found that Cawley's unauthorized public performance of the music was willful, he was still attempting to comply with the terminated agreement by sending the 1987, 1988 and 1989 annual reports to ASCAP. Furthermore, Cawley authorized the Radio Music License Committee to negotiate with ASCAP on the behalf of WMJK and his New Jersey station for licenses to perform music publicly, effective January 1, 1991.[6] (Transcript, p. 53).

Upon reviewing the evidence, the court finds that statutory damages in the amount of $1,500 for each infringement is appropriate, totaling $22,500.00. Therefore, the Clerk shall enter judgment in favor of plaintiffs against defendant Augustine

Cawley for $22,500.00 plus interest from the date of judgment.

Pursuant to 17 U.S.C. § 505, plaintiffs have asked for allowance of costs and attorneys' fees in this action. Plaintiffs shall, within ten (10) days from receipt of a copy of this Order, file a proper request with the Clerk of this Court for the assessment of costs. Within thirty (30) days from receipt of a copy of this Order plaintiffs shall submit such statement of costs, along with their statement of attorneys' fees, supported by proper vouchers and such affidavits they desire to submit, and such brief in support thereof as they desire the court to consider. The defendant may file such counter affidavits in opposition as he may desire the court to consider, along with a brief in opposition within twenty (20) days after receipt of plaintiffs' claim and brief. The court will thereafter proceed to rule on such request.

IT IS SO ORDERED.

---

**6.** However, evidence shows that WMJK has failed to pay required license fees regarding this license agreement. Whether this is still Cawley's responsibility now that WMJK is sold, was not addressed at trial.